[No. 61448-2.    En Banc.    October 6, 1994.]

WALLACE REAL ESTATE INVESTMENT INC., *Petitioner*, v. JOANNA C. GROVES, ET AL, *Respondents*.

882

*Mathews Garlington-Mathews & Chesnin* and *Harold Chesnin,* for petitioner.

*Steven P. Michael,* for respondents.

MADSEN, J. — The principal issue in this case is whether liquidated damages provisions in a commercial real estate purchase and sale agreement were properly upheld in the courts below.

## FACTS

Joanna Groves and her cousins, Charles and James Siler (the sellers), own 10 acres of undeveloped commercial property in Everett. Report of Proceedings (RP), at 27, 29. On August 1, 1989, the sellers entered into an agreement with Roddy Cox whereby Cox agreed to pay $1,520,000 for the property. Clerk's Papers (CP), at 24. Real estate prices were in flux at the time, and the sellers established the purchase price to encourage a quick, cash sale. CP, at 23. (The sellers also needed the funds that the sale would generate. CP, at 197; RP, at 339-40).

Cox gave the sellers a $20,000 note as a down payment. The agreement gave Cox 30 days to conduct a feasibility study for the potential development of an apartment complex. CP, at 24; Ex. 7. After this 30-day period, Cox could either abandon the property and receive back its note, or exchange the note for cash. CP, at 24. If Cox went ahead with the sale, it would close within 60 to 90 days. CP, at 24. A standard form liquidated damages provision applied to the deposit, stating that "[i]n the event of default by Buyer, Seller shall have the election to retain the earnest money as liquidated damages." CP, at 167.

An addendum to the purchase and sale agreement added extension periods for closing. CP, at 24. For each additional 30-day delay, Cox agreed to pay $15,000. CP, at 24. This amount was suggested by Cox. The $15,000 amount represented the lost investment value of the purchase price, calculated at 12 percent simple interest on the investment value not realized. Findings of fact 8, 9; CP, at 24-25. The interest component thus compensated the sellers for holding the property off the market. Finding of fact 9; CP, at 25. The addendum authorized up to 12 extensions of 30 days each, and stated that the deposit and extension payments were nonrefundable. Ex. 7.

Cox negotiated this agreement with the intention of assigning his interest to Wallace Real Estate Investment, Inc., which he did in September 1989. RP, at 95. During the negotiations, Cox consulted with William Wallace, president of Wallace Real Estate Investment, Inc., about the sellers' objectives and terms, including the purpose of the extension payments. RP, at 461-62.

After the last $15,000 extension payment permitted by the addendum, the parties negotiated a second addendum. CP, at 25. During the negotiations, Wallace and the sellers exchanged at least three versions of the second addendum before Cox and the sellers executed the final version on September 19, 1990. Ex. 8. Wallace countersigned the second addendum, which provided for $30,000 extension payments for October and November 1990 and established December 17, 1990, as the new closing date. Ex. 8.

The liquidated damages provision to the second addendum provided as follows:

> Liquidated damages: The parties hereto agree that in the event Buyer or its assign fails to comply with the terms of this Agreement, as amended and compromised, Seller shall retain all payments made to date (earnest money and extension payments), as liquidated damages and not as penalty, in order to indemnify the Seller against loss as a result of breach of this agreement. It is agreed that damages that result to Seller include: freezing the purchase price at a time when real estate land values were escalating at unprecedented rates; compensating seller for holding the property off the market and losing the time value of its property were the property liquidated and funds invested; lost opportunity for larger profits; and related costs. Sellers and Buyer, and its assign, recognize a general measure of the damages to Seller is represented by the earnest money and extension payments. It is further agreed that the damages that may result from a breach of this agreement are uncertain and difficult to ascertain any more than Seller and Buyer have done, and that the agreed amount is a reasonable estimate of the probable damages to Seller.

Ex. 8, at 2.

On December 13, 1990, William Wallace wrote the sellers, stating that he could not close on December 17 and requesting "a new agreement with everyone to close on or about January 7, 1991." Ex. 49. The sellers refused and, in a December 14, 1990, letter, informed Wallace that they were prepared to close as scheduled on December 17, 1990. Ex. 10; RP, at 145.

On December 17, Joanna Groves and Charles Siler attended the closing. James Siler, who lived in Oregon, could not attend because of a back injury. CP, at 26. Wallace also did not attend, though he did fax a letter stating that closing could not take place as scheduled because of two problems with the title. Ex. 36. Despite Wallace's absence, Groves express mailed the deed and closing papers to James Siler. Siler signed and returned the documents to Groves, who delivered them to escrow on December 21, 1990. CP, at 27; RP, at 65-66; Exs. 11, 50. (The contract provided that if the sale could not be closed by the date provided because of the

incapacitating illness of either party, the closing date would be extended no more than 14 days. Ex. 7, at 2.

On December 24, 1990, the escrow agent received the sellers' notice of cancellation, which they had executed on December 21, 1990. RP, at 65-66. The sellers then retained the $260,000 in earnest money and extension payments as liquidated damages. Wallace filed suit seeking to recover the moneys paid. CP, at 139. His additional claims for specific performance and breach of contract were dismissed on summary judgment. CP, at 125. The sole issue at trial was the validity of the liquidated damages provisions.

The trial court ruled in favor of the sellers and awarded them reasonable attorneys' fees and costs. The Court of Appeals affirmed after applying the test for evaluating liquidated damages provisions set forth in *Watson v. Ingram*, 70 Wn. App. 45, 47, 851 P.2d 761 (1993), *aff'd*, 124 Wn.2d 845 (1994). *Wallace Real Estate Inv., Inc. v. Groves*, 72 Wn. App. 759, 767, 868 P.2d 149 (1994). The Court of Appeals found both the $15,000 and $30,000 extension payments reasonable forecasts of just compensation for the damages sustained from Wallace's breach. *Wallace*, at 769-70.

Wallace then sought review in this court on the ground that the Court of Appeals erred in applying the *Watson* test instead of that articulated in *Lind Bldg. Corp. v. Pacific Bellevue Devs.*, 55 Wn. App. 70, 776 P.2d 977, *review denied*, 113 Wn.2d 1021 (1989). This court accepted review of *Wallace* as well as *Watson*.

I

In Washington, a provision for liquidated damages will be upheld unless it is a penalty or otherwise unlawful. *Walter Implement, Inc. v. Focht*, 107 Wn.2d 553, 558, 730 P.2d 1340 (1987); *Brower Co. v. Garrison*, 2 Wn. App. 424, 432, 468 P.2d 469 (1970). This court follows the United States Supreme Court's view that liquidated damages agreements fairly and understandingly entered into by experienced, equal parties with a view to just compensation for the anticipated loss should be enforced. *Walter Implement*, at 558 (cit-

ing *Wise v. United States*, 249 U.S. 361, 63 L. Ed. 647, 39 S. Ct. 303 (1919)).

There are several advantages to stipulating in advance the amount of damages that will be awarded on breach:

> For both parties, it may facilitate the calculation of risks and reduce the cost of proof. For the injured party, it may afford the only possibility of compensation for loss that is not susceptible of proof with sufficient certainty. For society as a whole, it may save the time of judges, juries, and witnesses, as well as the parties, and may cut the expense of litigation.

3 E. Allan Farnsworth, *Contracts* § 12.18, at 283 (1990); James A. Weisfield, Note, *"Keep the Change!": A Critique of the No Actual Injury Defense to Liquidated Damages*, 65 Wash. L. Rev. 977, 978-79 (1990).

At issue here are the discrepancies between two tests applied by the Court of Appeals to evaluate the validity of liquidated damages provisions in real estate contracts. The first test was set forth in *Lind Bldg. Corp. v. Pacific Bellevue Devs.*, 55 Wn. App. 70, 776 P.2d 977, *review denied*, 113 Wn.2d 1021 (1989). *Lind* involved a commercial real estate sales agreement that originally required Lind, the buyer, to pay a $20,000 deposit that would be retained as liquidated damages in case of Lind's default. The agreement further provided for payment of a $20,000 deposit for extending the contingency period and payment of a $50,000 deposit following the removal of two contingencies. When the sale did not close on January 15, the closing date specified, Lind requested an extension to February 6. The seller granted the extension on the condition that Lind pay $20,000 as consideration therefor. When the transaction did not close on February 6, Lind requested a second extension. The seller agreed to grant a 3-month extension, provided Lind paid an initial $10,000 to extend the closing and then $30,000 on February 20, $100,000 on March 6, and $500,000 on May 6, the date of closing. *Lind*, at 71-72. Lind made all of the payments except the final $500,000, for a total of $250,000. When the transaction did not close on May 6, the seller refused to further extend the closing and told Lind that it

had forfeited the $250,000 previously deposited. On June 5, the seller entered into a contract with a different buyer to sell the property for $5,150,000, which was $1 million more than the $4,144,085 that Lind had contracted to pay. This sale closed as scheduled 3 months later.

Lind sued to recover the $250,000 in deposits and payments paid on the transaction, contending that the liquidated damages clause imposed a penalty and was unenforceable because the seller suffered no actual damages as a result of Lind's default. *Lind*, at 73. The Court of Appeals agreed and concluded that the $250,000 amounted to a penalty rather than liquidated damages because of the absence of the following three requirements: (1) the parties to the agreement must estimate the just compensation for damages anticipated from a breach; (2) the party who would collect the liquidated damages must have suffered some actual loss because liquidated damages are meant to be compensation for loss and not punishment for failure to perform; and (3) the alleged losses must be difficult to prove at trial. *Lind*, at 78-81.

The Court of Appeals modified these requirements when confronted with the validity of a liquidated damages provision in a residential real estate agreement. *Watson v. Ingram*, 70 Wn. App. 45, 851 P.2d 761 (1993), *aff'd*, 124 Wn.2d 845 (1994). At issue in *Watson* was a liquidated damages provision requiring the forfeiture of $15,000 paid as earnest money if Watson, the buyer, defaulted on the purchase of a $355,000 home. *Watson*, at 47. Watson did default, and the seller retained the $15,000 earnest money. The seller sold the house 9 months after Watson's default for the original $355,000 price.

Watson argued that the liquidated damages provision was a penalty for his failure to perform and thus unenforceable, but the Court of Appeals disagreed. The court concluded that the $15,000 earnest money was less than 5 percent of the asking price and a reasonable forecast of the possible damages. *Watson*, at 53. The court held that so long as the deposit amount agreed on was not so disproportionate to

possible damages as to be unconscionable, when estimated from the time of contracting, the terms of the earnest money agreement should be enforced without regard to the retrospective calculation of actual damages or the ease with which they might be proved. *Watson*, at 54.

In the present case, the Court of Appeals chose to apply *Watson* instead of *Lind* and upheld the liquidated damages provisions because, at the time of contracting, the record showed that the amounts withheld as liquidated damages were a reasonable forecast of just compensation for the anticipated breach. *Wallace*, at 768-70.

Previous holdings of this court foreshadow *Watson* more closely than *Lind. See* Weisfield, at 984-85. This court adopted the 2-part Restatement test for evaluating liquidated damages provisions in *Management, Inc. v. Schassberger*, 39 Wn.2d 321, 328, 235 P.2d 293 (1951). The court there held that a liquidated damages provision is enforceable if (1) the amount so fixed is a reasonable forecast of just compensation for the harm caused by the breach, and (2) the harm caused by the breach is incapable or very difficult of accurate estimation. *Management, Inc.*, at 328 (citing Restatement of Contracts § 339, at 552 (1932)).[1]

This court applied the *Management, Inc.*, test in *Walter Implement*, adding that "[r]easonableness of the forecast will be judged as of the time the contract was entered." *Walter Implement*, at 559; *see also Brower*, at 433 (test of anticipated damages looks to the time of contracting, not to later time). The court in *Walter Implement* also observed, however, that " '[a] provision in a contract which bears no reasonable relation to actual damages will be construed as a penalty.' " *Walter Implement*, at 559 (quoting *Northwest Collectors, Inc. v. Enders*, 74 Wn.2d 585, 594, 446 P.2d 200 (1968)); *see also Mead v. Anton*, 33 Wn.2d 741, 761-62, 207 P.2d 227, 10 A.L.R.2d 588 (1949).

---

[1]The Restatement rule was redrafted to hold that liquidated damages provisions are permissible "only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss." Restatement (Second) of Contracts § 356 (1981).

Thus, prior to *Lind*, Washington case law focused on the reasonableness of a damages estimate, assessed at the time of contracting. Actual damages were relevant only where liquidated damages would be greatly disproportionate to such damages. *But see Mead*, at 756 (evidence of no actual damage "immaterial"); *Pettet v. Wonders*, 23 Wn. App. 795, 802, 599 P.2d 1297 (upholding trial court's refusal to admit testimony showing a subsequent sale for a higher price because the test of reasonableness looks to the time that the agreement was entered), *review denied*, 93 Wn.2d 1002 (1979). Although not expressly stated in prior cases, the difficulty of estimating damages was also to be assessed as of the time of contracting. *See* Weisfield, at 984 (by adopting Restatement § 339(1), Washington courts have likely made contract formation the proper vantage point for testing the uncertainty of damages). Our prior case law, then, supports the position taken by the Court of Appeals that reasonableness at the time of contracting is the key in evaluating liquidated damages clauses.

Commentators who have addressed the issue of liquidated damages have also focused on the reasonableness factor, questioning the value of the added requirements that damages be difficult to prove and that actual damages be suffered as prerequisites to enforcing a liquidated damages clause. John D. Calamari & Joseph M. Perillo, *Contracts* § 14-31, at 565 (2d ed. 1977). As those commentators note, these added criteria are of limited importance — the pivotal factor is whether the sum provided for in the damages clause is a reasonable preestimate of probable loss. Calamari & Perillo, at 565. Another authority cites a shift in emphasis to the reasonableness issue, adding that "the trend has been to favor freedom of contract by enforcing such clauses as long as they do not clearly disregard the principle of compensation." 3 E. Allan Farnsworth, *Contracts* § 12.18, at 286 (1990); *see also* Grover C. Grismore, *Contracts* § 205, at 324 (rev. ed. 1965). Commentators also are in general agreement that reasonableness must be judged as of the time of contracting rather than as of the time of the

breach and ensuing damage. Calamari & Perillo, at 566; Farnsworth, at 289; Grismore, at 324; 25 C.J.S. *Damages* § 108, at 1056 (1966). Under this reasoning, the injured party does not have to show actual loss and, indeed, that loss is irrelevant except to show what loss was anticipated. Farnsworth, at 289.

Apart from their limited value in determining whether a liquidated damages provision represents compensation or an impermissible penalty, each of the additional factors required by *Lind* present other serious concerns. We will address these two factors separately.

### 1. Actual loss must be proved.

As one author writes, when the amount of actual damages is difficult to prove, such a requirement destroys the protection the parties sought to give the plaintiff. "The relatively few cases reaching this result are probably more an expression of an older attitude of hostility toward agreed damage clauses or toward a particular clause than expressions of a considered view of how to handle valid agreed damages clauses in court." Ian Macneil, *Power of Contract and Agreed Remedies,* 47 Cornell L.Q. 495, 509 (1962). Moreover, since reasonableness is determined at the time the contract is made, the fact that a change of circumstances obviates the accrual of actual damages should not affect the construction of the contract. 25 C.J.S. *Damages* § 108, at 1056-57 (1966); *see also* 5 Arthur L. Corbin, *Contracts* § 1063, at 368 (1964) (citing cases holding that vendor may retain all money deposited when vendee defaults, even if vendor thereafter sells land at advance in price); *Southwest Eng'g Co. v. United States,* 341 F.2d 998, 1001 (8th Cir.) (stipulation that injured party suffered no actual damages does not bar recovery of liquidated damages since estimate reasonable at time of contracting), *cert. denied,* 382 U.S. 819 (1965); *California & Hawaiian Sugar Co. v. Sun Ship, Inc.,* 794 F.2d 1433, 1437 (9th Cir.) (liquidated damages provision enforced in face of no actual damages), *cert. denied,* 484 U.S. 871 (1987).

A further concern with requiring proof of actual damage is that legal definitions of actual harm can be unduly restric-

tive, especially in the context of real estate transactions. Weisfield, at 993-94. The standard loss-of-bargain measure fails to compensate sellers for allowing potential buyers to hold salable property off the market before closing, and also fails to account for the probability that parties negotiated liquidated damages clauses to allocate risks of under-compensation.[2]

We also observe that requiring proof of actual injury ignores the sellers' transaction costs attributable to buyers' breach, as well as the reality that sellers may need sale proceeds to facilitate further transactions. Weisfield, at 994-95. One authority notes that a "no actual loss" bar to liquidated damages overlooks the situation where the breaching party would be unjustly enriched by the breach, "as where a seller has been paid a premium price for prompt delivery, but delivers tardily with no actual damage to the buyer." Calamari & Perillo, at 566.

While Washington courts have stressed their unwillingness to enforce an unconscionable result, they also have stated that they will enforce a contract mutually and fairly agreed upon:

> There is no reason why persons, competent and free to contract, may not agree upon this subject (liquidated damages) as fully as upon any other, or why their agreement when fairly and understandingly entered into with a view to just compensation for the anticipated loss, should not be enforced.

*Brower*, at 435 (quoting *Underwood v. Sterner*, 63 Wn.2d 360, 366, 387 P.2d 366 (1963)). Any requirement that actual damages be proved would undermine this principle of law. We thus conclude that proof of actual damages is not required as a prerequisite to upholding a liquidated damages clause.

---

[2]Wallace argues vigorously that keeping commercial property off the market does not constitute a damage suffered by the seller, but we find it reasonable that the holding of property pending a sale may be a source of damage to a seller, particularly where the sale ultimately fails.

## 2. Actual damages must be difficult to prove.

Apart from the inherent contradiction in requiring both proof of actual damages and the difficulty of such proof, there is support for eliminating the difficulty of proof requirement, at least as of the time of trial. As one commentator has noted:

> Although the ease of forecasting and proving loss may make it incumbent on the parties to make a more accurate forecast if it is to be sustained as reasonable, there is little sense in upsetting an accurate forecast on the ground that the loss was neither uncertain in amount nor difficult to prove.

Farnsworth § 12.18, at 288-89; *see also* Calamari & Perillo § 14-31, at 565 (difficulty of proof is of limited importance in light of the decisions where liquidated damages have been upheld although actual damages are readily calculable). This observation, as well as our discussion of actual damages, leads us to conclude that the difficulty of estimating damages is best treated simply as an element that affects the reasonableness of the damages estimated, rather than as a separate requirement.

In sum, we find the single-factor approach, which focuses on the reasonableness of the preestimate of loss, more supportable than the 3-factor *Lind* test, particularly in this commercial transaction. *See Watson v. Ingram*, 124 Wn.2d 845, 881 P.2d 247 (1994) (applying this approach in the residential context). In adopting this approach, however, it is also important to point out that while proof of actual damages is not a requirement under the reasonableness test, courts can consider such damages in evaluating the reasonableness of the preestimate. This court recognized the ability to employ both hindsight and foresight in *Walter Implement*. There, the court stated that while the reasonableness of a damages forecast will be judged as of the time the contract was entered, a provision in a contract that bears no reasonable relation to actual damages will be construed as a penalty. *Walter Implement*, at 559. This view is also supported by commentators who agree that a knowledge of actual damages suffered may have a role when

liquidated damages greatly exceed the injury suffered. 5 Arthur L. Corbin, *Contracts* § 1075, at 167 (Supp. 1993). While *probable* injury largely determines whether a preestimate of injury is reasonable, "the justice and equity of enforcement depend also upon the amount of injury that has actually occurred. . . . the court cannot help but be influenced by its knowledge of subsequent events." 5 Corbin § 1063, at 362-64.

We conclude that while proof of actual damages is no longer a requirement, nevertheless, actual damages may be considered where they are so disproportionate to the estimate that to enforce the estimate would be unconscionable. *See California & Hawaiian Sugar Co.*, at 1437 (Pennsylvania courts, like courts elsewhere, attempt to interpret liquidated damages test humanely and equitably).

Wallace next maintains that even under a reasonableness test, the liquidated damages provisions at issue must be held to be unenforceable penalties. In arguing that the 12 $15,000 extension payments were not a reasonable forecast of anticipated damages, Wallace maintains that the parties never discussed these extension payments as sums necessary to make the seller whole in case of breach. There is no requirement, however, regardless of which test is used, that the parties specifically discuss anticipated losses from a breach. *Wallace*, at 768 n.5; *Watson*, at 52. It is sufficient that the amount specified as liquidated damages is a reasonable forecast of the compensation necessary to make the seller whole should the buyer breach. *Watson*, at 53.

At trial, an economics professor testified to the reasonableness of the $15,000 extension payments. He testified that the $15,000 per payment based on 12 percent interest was reasonable because, at minimum, a lender would charge 12 percent interest to finance a project similar to that planned by Wallace. He also stated that Wallace's willingness to pay 13 percent interest on a loan to cover the extension payments further indicated the reasonableness of the $15,000 amount. *Wallace*, at 763-64; RP, at 410-11. The fact that RCW 19.52-

.010 provides an interest rate of 12 percent on certain contracts also supports a finding of reasonableness.

Wallace maintains, however, that to uphold any liquidated damages provision in excess of 5 percent of the total contract price violates legislative intent, as embodied by RCW 64.04.005. That statute provides that forfeiture of an earnest money deposit is valid, regardless of whether the seller incurs any actual damages, if the earnest money deposit does not exceed 5 percent of the purchase price.

■ Here, the $20,000 earnest money deposit was less than 5 percent of the purchase price. RCW 64.04.005 deals solely with such deposits and does not refer to extension payments, which are the source of the controversy here. The total sum forfeited in this case amounts to 17 percent of the contract price, which we do not find excessive. *See Walter Implement*, at 560 (20 percent figure may be sustainable in some cases).

Wallace also contends that the liquidated damages provisions are unreasonable because the sellers have suffered no actual damages. Given our above conclusion that the absence of actual damages is largely irrelevant to a discussion of the enforceability of liquidated damages provisions, we need not address this contention. We simply note the trial judge's observation on the issue:

> To argue that there is no damage — When this property has been held up for almost two years, when during that two-year period of time the property has been unmarketable, the sellers have grown older, have spent two precious years of their lives without 1.58 million dollars, or whatever the sale price was, to say that their having had to deal with lawyers and the insinuations and the inconvenience of litigation for a two-year period of time is not a damage?

RP, at 59.

Wallace also argues that the $30,000 extension payments are unenforceable because there was no rationale for increasing the amount of the payments other than penalizing him. The Court of Appeals disagreed, observing that the second addendum was even stronger than the first because it does not require after-the-fact analysis. The second adden-

dum explicitly stated that the $30,000 payments were intended to compensate the sellers for

> freezing the purchase price at a time when real estate land values were escalating at unprecedented rates; compensating seller for holding the property off the market and losing the time value of its property were the property liquidated and funds invested; lost opportunity for larger profits; and related costs.

Ex. 8. The Court of Appeals also observed that the increased payment was reasonable in light of the facts that Wallace had made no payments other than extension payments, that the sellers had wanted a quick, prompt cash sale, and that there was a substantial change in the liquidity of the property. *Wallace*, at 770.

We find another factor to be of particular significance in discussing the reasonableness of these extension payments. According to one commentator, party sophistication will often be relevant in determining the fairness of a stipulated damages provision. Charles J. Goetz & Robert E. Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach*, 77 Colum. L. Rev. 554, 593 (1977). The sophistication factor may point to the increased enforceability of liquidated damages provisions in commercial agreements. In *Walter Implement*, this court noted the importance of "experienced, equal parties" in upholding a liquidated damages provision. *Walter Implement*, at 558. In *Brower*, the Court of Appeals cited as support for the reasonableness of the clause at issue the fact that the parties "were all experienced businessmen." *Brower*, at 434.

In this case, the sellers were private parties, and the buyer was the experienced businessman. William Wallace's resume lists as one of his professional skills "[n]egotiating and writing purchase and sales agreements . . . so that all transactions are consistent with the investment objectives of all the principals. . . ." Ex. 46. The record also showed that Cox and Wallace discussed the proposed liquidated damages in light of *Lind* before the second addendum was signed. RP,

at 461-62. Wallace's expertise supports the enforceability of the liquidated damages provisions and also highlights the inequity of allowing him to now challenge the provisions as penalties simply because they constitute too large a percentage of the contract price.

We thus conclude that enforceability of a liquidated damages clause in a commercial transaction rests on whether the liquidated sum is a reasonable preestimate of loss. Further, we affirm the Court of Appeals' decision that the liquidated damages provisions at issue here were enforceable under the reasonableness test.

## II

Also at issue is whether Wallace is entitled to a return of the payments forfeited because the sellers failed to concurrently perform under the purchase and sale agreement. Wallace argues here, as he did in both courts below, that the sellers' failure to perform as required on December 17, the date of closing, places the sellers in default and warrants a return of all payments made to them.

If a contract requires performance by both parties, the party claiming nonperformance of the other must establish as a matter of fact the party's own performance. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986); *Reynolds Metals Co. v. Electric Smith Constr. & Equip. Co.*, 4 Wn. App. 695, 698, 483 P.2d 880 (1971). A vendor selling land may not put the buyer in default until the vendor has offered to perform; the payment of the purchase price and the delivering of the deed are concurrent acts. *Willener*, at 395; *Bendon v. Parfit*, 74 Wash. 645, 648, 134 P. 185 (1913).

■ Both the trial court and Court of Appeals concluded that Wallace's December 13 letter to the sellers constituted an anticipatory breach of the contract and relieved the sellers of any duty to perform. *Wallace*, at 773; conclusions of law 4, 5; CP, at 28. Wallace's December 13 letter listed several problems he was having with the agreement and stated

*I am prepared to close with all the sellers on the same date. This* would have been done on December 17, 1990 had not (i) the Phase I sellers unexpectedly demanded a January closing,

and (ii) Cox's attempts to prevent my closing unless I pay him more money than he had agreed to. . . . I request a new agreement with everyone to close on or about January 7, 1991.

Ex. 49.

Wallace contends that his December 13 letter did not constitute an anticipatory breach, and cites as support *Olsen Media v. Energy Sciences, Inc.*, 32 Wn. App. 579, 585, 648 P.2d 493, *review denied*, 98 Wn.2d 1004 (1982) and *Lovric v. Dunatov*, 18 Wn. App. 274, 282, 567 P.2d 678 (1977). *Lovric* states that an anticipatory breach occurs when one of the parties to a bilateral contract either expressly or impliedly repudiates the contract prior to the time of performance. A party's intent not to perform may not be implied from doubtful and indefinite statements that performance may or may not take place. *Lovric*, at 282. Rather, an anticipatory breach is a " 'positive statement or action by the promisor indicating distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations.' " *Olsen Media* at 585 (quoting *Lovric*, at 282). Neither case presents a communication similar to Wallace's December 13 letter. In *Olsen Media*, a letter raising a question as to the extent of services was found not to be an anticipatory breach, and in *Lovric*, a letter stating that the defendants "may" not be able to perform also did not constitute an anticipatory breach. Wallace's letter stated that he could not perform on December 17 and requested a new agreement. In the words of the trial court, the letter "was clearly an anticipatory breach."

> The sellers would have been perfectly entitled in not even showing up themselves on the 17th. They are not required to do a useless act. They were told that payments into escrow would not be made; that the defendant would not tender into closing; and they were entitled to rely on that information. Everything in the history of their dealing with this purchaser supported the conclusion that when he said he wasn't going to be there with his $1.5 million, then he wasn't going to be there. Their performance, in a sense, was excused by the prior breach, the anticipated breach, by the buyer/plaintiff.

Trial Court's Oral Decision; CP, at 203. We agree with both the trial court and the Court of Appeals that Wallace's December 13 letter constituted an anticipatory breach.

Wallace now maintains, as he did before the Court of Appeals, that his December 17 fax withdrew his earlier repudiation. The Court of Appeals observed that the trial court made no findings on this issue, and stated that the absence of a finding of fact in favor of the party with the burden of proof about a disputed issue is the equivalent of a finding against that party on that issue. *Wallace*, at 773 n.9 (citing *In re Marriage of Olivares*, 69 Wn. App. 324, 334, 848 P.2d 1281, *review denied*, 122 Wn.2d 1009 (1993)). The Court of Appeals thus found that this argument did not merit discussion.

Even if the terms of the fax are considered, they do not appear to amount to a repudiation of the breach. In the fax, Wallace again reiterates that he will not close on the 17th, this time because of alleged title problems. Ex. 36.

Given our conclusion that Wallace's December 13 letter constituted an anticipatory breach of the agreement, we find the sellers' subsequent performance of their contractual obligations was irrelevant. We thus affirm the Court of Appeals' decision upholding the judgment of the trial court and the enforceability of the liquidated damages provisions at issue.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.