IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| HARTY INVESTMENT GROUP, LLC, a Washington limited liability company, | No. 77267-8-I |
| Respondent, | DIVISION ONE |
| v. | |
| CHG SF, LLC, a Washington limited liability company, | UNPUBLISHED OPINION |
| Appellant. | FILED: March 11, 2019 |

SMITH, J. — CHG SF LLC (CHG) appeals the trial court's grant of summary judgment in favor of Harty Investment Group LLC (Harty Group) and the court's dismissal of CHG's counterclaims against Harty Group. Because CHG failed to raise a genuine issue of material fact regarding whether it anticipatorily repudiated its agreement with Harty Group, summary judgment was proper. Therefore, we affirm.

FACTS

Harty Group and CHG are companies engaged in buying, developing, and selling real property. In March 2016, Harty Group and CHG entered into a real estate purchase and sale agreement (PSA) whereby CHG agreed to purchase certain property located in Kirkland (Property) from Harty Group. The purchase price for the Property was $2,816,000, and CHG made an earnest money deposit

of $140,800. The earnest money deposit was secured by a deed of trust encumbering the Property.

The PSA contained an "Engineering Approval" provision that provides, in relevant part:

> As used herein, "**Engineering Approval**" means that (a) the Permitting Jurisdiction has approved Seller's engineering and construction plans for its intended residential development on the Property, and (b) all appeal periods, if any, have expired or any appeals have been successfully concluded, as the case may be. Seller shall use diligent and good faith efforts to obtain Engineering Approval, at Seller's sole cost and expense as soon as reasonably possible. If Seller is unable to obtain Engineering Approval by Outside Closing Date, unless Purchaser waives the requirement for Engineering Approval in writing, this Agreement shall terminate, and upon such termination any and all Earnest Money previously deposited . . . shall be returned to Purchaser. Before submitting any plans, modifications, or appeals or other materials for Engineering Approval to the Permitting Jurisdiction, Seller shall submit such applications or materials to Purchaser for Purchaser's prior written approval, which approval shall not be unreasonably withheld and shall be deemed granted if Purchaser fails to respond with written notice of disapproval within 5 business days after receipt of such applications or material from Seller.[1]

The "Permitting Jurisdiction" was the city of Kirkland (City), and the "Outside Closing Date" was December 31, 2016.

It is undisputed that one of the components of Engineering Approval was the City's approval of a land surface modification (LSM) permit to develop the Property. Harty Group applied for the LSM permit, and on October 11, 2016, the City provided comments to the engineering plans for the LSM permit. On October 25, 2016, Harty Group's principal, Luay Joudeh, met with Michael Lorenz and Aron Golden of CHG to discuss the City's comments. On October

---

[1] (Bold in original.)

2

27, 2016, Joudeh sent Lorenz and Golden an e-mail providing, in relevant part:

> Gentlemen
>
> We are submitting revised LSM plans and reports to City for final review. Once the LSM is approved, I will have met the condition of closing.

Golden responded via e-mail that "[w]e want to be sure what you resubmit will work for us." He mentioned in his e-mail concerns regarding the revised plans and expressed that "[i]t would be good to go over items prior to resubmittal." Joudeh e-mailed the revised LSM plans to Golden and Lorenz on October 27, 2016, and Golden confirmed receipt.

On November 9, 2016, Lorenz e-mailed Joudeh as follows:

> Luay
>
> Bad news. We have completed our estimates for the modified [LSM] plans that you have produced based on the City's input.
>
> The increase in combined costs has exceeded our original estimates by $338,045.
>
> This is clearly a significant impact.
>
> We have held prices on the homes as high as we could be [sic] are not able to cover the cost impacts.
>
> I propose that we reduce the land price to $2,475,000 and keep going. We will need to execute on one extension for the Closing.
>
> If this doesn't work then we'll have to terminate the transaction finding the Engineering Approval Contingency unsatisfactory.
>
> I'm really surprised that the City has layered so many expensive requirements on this small project – it's tough to spread that cost amongst the 11 lots.
>
> I'll call you to go over this.

Harty Group declined to reduce the price for the Property, and the sale of the Property ultimately did not close. CHG demanded a return of its earnest money and in January 2017 declared a default under the deed of trust securing the earnest money deposit. On February 14, 2017, Harty Group sued for breach of contract and to enjoin CHG's foreclosure of the deed of trust. CHG counterclaimed for breach of contract and foreclosure. Harty Group moved for summary judgment, arguing that Lorenz's November 9, 2016, e-mail constituted an anticipatory repudiation of the PSA. The trial court granted Harty Group's motion and summarily dismissed CHG's counterclaims. CHG appeals.

DISCUSSION

*Summary Judgment*

CHG argues that the trial court erred by summarily concluding that Lorenz's November 9, 2016, e-mail constituted an anticipatory repudiation of the PSA.[2] We disagree.

We review summary judgment orders de novo, viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). "[S]ummary judgment is appropriate where there is 'no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012) (second alteration in original) (quoting CR 56(c)). Once the moving party shows there are no genuine

---

[2] The trial court did not enter written conclusions. But anticipatory repudiation was the only theory argued in Harty Group's motion for summary judgment.

issues of material fact, "[t]he nonmoving party may not rely on speculation, argumentative assertions, 'or in having its affidavits considered at face value; for after the moving party submits adequate affidavits, the nonmoving party must set forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists.'" Becker v. Wash. State Univ., 165 Wn. App. 235, 245-46, 266 P.3d 893 (2011) (quoting Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986)).

An anticipatory repudiation occurs "when one of the parties to a bilateral contract either expressly or impliedly repudiates the contract prior to the time of performance." Wallace Real Estate Inv., Inc. v. Groves, 124 Wn.2d 881, 898, 881 P.2d 1010 (1994). "A party's intent not to perform may not be implied from doubtful and indefinite statements that performance may or may not take place." Wallace Real Estate, 124 Wn.2d at 898. "Rather, an anticipatory breach is a 'positive statement or action by the promisor indicating distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations.'" Wallace Real Estate, 124 Wn.2d at 898 (internal quotation marks omitted) (quoting Olsen Media v. Energy Scis., Inc., 32 Wn. App. 579, 585, 648 P.2d 493 (1982)). An anticipatory repudiation occurs when one party states its intention not to perform except under additional terms that go beyond the contract. Highlands Plaza, Inc. v. Viking Inv. Corp., 72 Wn.2d 865, 878, 435 P.2d 669 (1967) (concluding that party anticipatorily breached contract by demanding other party's performance before it was due); see also 17A AM. JUR. 2D Contracts § 695 at 676 (2016) ("Language that amounts to a statement of

intention that one will not perform except on conditions that go beyond the contract, or unless the other party meets additional terms, constitutes a repudiation."); RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b at 273 (AM. LAW INST. 1981) ("[L]anguage that under a fair reading 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' constitutes a repudiation.") (quoting U.C.C. § 2-610 cmt. 2 (1978)). Although anticipatory repudiation is a question of fact, it can be decided on summary judgment "if, taking all evidence in the light most favorable to the non-moving party, reasonable minds can reach only one conclusion." Alaska Pac. Trading Co. v. Eagon Forest Prods., Inc., 85 Wn. App. 354, 365, 933 P.2d 417 (1997).

Here, Lorenz's November 9, 2016, e-mail to Joudeh unequivocally stated that CHG planned to terminate the PSA unless Harty Group agreed to lower the purchase price from $2,816,000 to $2,475,000, a reduction of $341,000. And although Lorenz indicated in his e-mail to Joudeh that CHG would terminate by "finding the Engineering Approval Contingency unsatisfactory," CHG had no right to terminate under the Engineering Approval provision or to deem that condition unsatisfactory. Rather, the fulfillment of the Engineering Approval condition depended solely on the City's—not CHG's—approval of the relevant engineering and construction plans. In short, Lorenz's November 9, 2016, e-mail was an unambiguous statement that CHG would wrongfully terminate the transaction unless Harty Group agreed to modify a material term of the PSA, the purchase price. Therefore, reasonable minds could reach but one conclusion: CHG repudiated by stating its intent not to perform unless Harty Group agreed to a

condition that went beyond the contract. For these reasons, summary judgment was proper.

CHG argues that the trial court nonetheless erred by failing to address whether Harty Group completed its performance under the Engineering Approval provision. Specifically, CHG cites Wallace Real Estate for the proposition that Harty Group was required to establish its own performance. But CHG's reliance on Wallace Real Estate is misplaced. In that case, the court did state the general rule that "[i]f a contract requires performance by both parties, the party claiming nonperformance of the other must establish as a matter of fact the party's own performance." Wallace Real Estate, 124 Wn.2d at 897. But the court then concluded that the buyer in that case anticipatorily repudiated by sending the sellers a letter indicating he would not be able to close on the agreed-upon date and requesting an extension. Wallace Real Estate, 124 Wn.2d at 898. Accordingly, the sellers' performance of their contractual obligations was excused. Wallace Real Estate, 124 Wn.2d at 899. If anything, Wallace Real Estate supports Harty Group and confirms both that (a) CHG's request for a price reduction constituted repudiation, and (b) because CHG repudiated, Harty Group's performance was excused.

Puget Sound Service Corporation v. Bush, 45 Wn. App. 312, 724 P.2d 1127 (1986), is also instructive here and confirms that Harty Group's performance was excused because CHG repudiated when Harty Group still had time to perform. In Puget Sound, Robert and Lee Bush entered into an agreement to purchase a condominium with private moorage from Puget Sound

Service Corporation (Puget Sound). Puget Sound, 45 Wn. App. at 314. Shortly before the closing, the Bushes tried to moor their boat in their assigned slip and experienced difficulty because the slip was not as large as Puget Sound had represented it to be. Puget Sound, 45 Wn. App. at 315. The Bushes advised Puget Sound of the issue, and Puget Sound responded that the problem would be remedied. Puget Sound, 45 Wn. App. at 315. But the Bushes did not believe that the slip would be made to conform, sent a letter to Puget Sound indicating that they were rescinding the transaction, and demanded the return of their earnest money. Puget Sound, 45 Wn. App. at 315.

Puget Sound sued the Bushes for breach of contract, and the trial court concluded that the Bushes improperly rescinded the agreement. Puget Sound, 45 Wn. App. at 315. But the court nonetheless dismissed Puget Sound's claim, concluding that Puget Sound had failed to demonstrate that a condition precedent to closing would have been satisfied—namely, that Puget Sound's owner would provide the Bushes with financing for the purchase on specified terms. Puget Sound, 45 Wn. App. at 315-16. The court noted that although the Bushes' loan application was approved, the terms of the financing were not consistent with the terms specified in the agreement. Puget Sound, 45 Wn. App. at 316.

We reversed, reasoning: "Since Puget Sound still had time to comply with the condition precedent, the Bushes' action excused Puget Sound's performance." Puget Sound, 45 Wn. App. at 318. We explained:

> The Bushes' repudiation excused Puget Sound from
> performing the condition precedent of acquiring the agreed

*financing. It was not necessary for Puget Sound to prove as part of its cause of action that it would have satisfied the condition precedent prior to closing.* The burden of proof was on the Bushes to demonstrate that, despite their improper repudiation, the condition precedent of providing the required financing would not have been satisfied. The trial court erroneously placed the burden of proof on [Puget Sound].

Puget Sound, 45 Wn. App. at 319 (emphasis added) (citation omitted).

Here, as in Puget Sound, Harty Group still had time to comply with the Engineering Approval provision when CHG repudiated. Specifically, it is undisputed that a 30-day appeal period applies to the relevant City approvals under the Engineering Approval provision. And "Engineering Approval" means not only that the City has approved the relevant engineering and construction plans but also that all appeal periods have expired. Accordingly, to satisfy Engineering Approval by December 31, 2016, Harty Group had until December 1, 2016, at the latest to obtain the City's approval of the relevant plans. Nonetheless, Lorenz sent his repudiatory e-mail to Joudeh on November 9, 2016—a full three weeks earlier. Here, as in Puget Sound, CHG's premature repudiation excused Harty Group from obtaining Engineering Approval. Therefore, we are not persuaded by CHG's argument that Harty Group was required to establish its own performance.

CHG attempts to distinguish Puget Sound by arguing that CHG construed Joudeh's October 27, 2016, e-mail as a refusal to complete a required storm water vault design for the Property and that, unlike Puget Sound, Harty Group did not provide any assurances that it would complete its performance. But in Puget Sound, the Bushes advised Puget Sound of the problem with the slip before

repudiating on that basis. Puget Sound, 45 Wn. App. at 315, 317. By contrast, CHG does not point to any evidence that it advised Harty Group, before repudiating, that it construed Joudeh's e-mail as a refusal to provide the vault design, or that CHG considered that refusal a breach of the PSA. Thus, unlike Puget Sound, Harty Group had no occasion to offer any assurances. CHG's argument is unpersuasive.

CHG next argues that it overcame any "presumption" of performance under Puget Sound by demonstrating that Harty Group "did not, and could not, fully perform its end of the bargain." But CHG does not point to any evidence that creates a genuine issue of material fact on this matter. CHG first points to evidence of a dispute about whether a storm water vault design was part of the Engineering Approval requirement. We need not resolve that dispute because even assuming that the vault design *was* part of the requirement, CHG has not raised a genuine issue of material fact as to whether Harty Group would have timely obtained Engineering Approval if CHG had not repudiated. Specifically, CHG, which under Puget Sound bears the burden of proof on this issue, has not pointed to any evidence that rebuts Joudeh's declaration testimony that the engineering design for a storm water vault costs about $4,000 to $5,000 and can be obtained in a week or less. CHG points out that the vault design ultimately was not completed until December 9, 2016, but that fact alone does not create a genuine issue of material fact as to whether the design *would* have been timely completed had CHG not repudiated. Furthermore, CHG has not cited any evidence from which the court could make a reasonable inference that had CHG

indicated to Harty Group before repudiating that CHG considered Joudeh's October 27, 2016, e-mail a breach of the PSA, Harty Group would have insisted on not providing the vault design.

CHG also points to the fact that Harty Group did not obtain a right-of-way permit from Puget Sound Energy or apply for a right-of-use permit from Northshore Utility District and did not take action on these claimed deficiencies until it was too late to meet the deadline for Engineering Approval. But the Engineering Approval provision does not require Harty Group to obtain approvals from utilities—it only requires approval from the "Permitting Jurisdiction," which is the City.[3] In short, CHG has not cited any evidence in the record that creates a genuine issue of material fact as to whether, absent CHG's repudiation, Harty Group would have timely obtained Engineering Approval. Accordingly, CHG's argument that it has overcome the "presumption" that Harty Group could have performed is unpersuasive.

Relying on an excerpt from American Jurisprudence 2d, CHG next argues that Joudeh's e-mail constituted a breach of the PSA because his e-mail indicated that Harty Group was refusing to provide a storm water vault design. But the excerpted section of American Jurisprudence 2d does not help CHG here. It provides:

> [W]here the parties differ as to the interpretation of a contract, a demand that the contract be performed according to one party's interpretation does not constitute a repudiation, *unless the demand*

---

[3] By way of contrast, "Preliminary Plat Approval" requires the approval of the Permitting Jurisdiction "and all other governmental agencies or utilities with jurisdiction over the Property."

*is accompanied by a clear expression of the intent not to perform under any other interpretation.*

17A AM. JUR. 2D Contracts § 695 at 676 (emphasis added). Joudeh's October 27, 2016, e-mail merely states that "[o]nce the LSM is approved, I will have met the condition of closing." This statement was not accompanied by any clear expression of an intent not to perform under any interpretation of the PSA other than an interpretation under which the vault design was excluded from Engineering Approval. CHG's argument is not persuasive.

CHG also asserts that Lorenz's November 9, 2016, e-mail was merely an exercise of CHG's contractual rights under the Engineering Approval provision. But CHG does not specify what right it refers to, and as discussed, the Engineering Approval provision did not give CHG a right to terminate the PSA. CHG did have a right under that provision to approve the LSM plans before Harty Group submitted them to the City. But CHG's argument that Lorenz's November 9, 2016, e-mail was intended to communicate CHG's disapproval of the LSM plans is not persuasive because Lorenz's e-mail does not contain any statement that could reasonably be construed as a notice of disapproval of the LSM plans.

Furthermore, by November 9, 2016, the LSM plans were already deemed approved under the Engineering Approval provision. Specifically, that provision states materials are deemed approved by CHG if CHG fails to respond with written notice of disapproval within five business days after receipt. CHG does not dispute that it received the LSM plans from Joudeh on October 27, 2016. And although CHG argues that plans were later uploaded to a Dropbox account that Harty Group set up for the transaction, CHG does not point to any evidence

in the record to rebut Joudeh's testimony that the plans he uploaded to Dropbox a few days later were the same plans that CHG acknowledged receiving on October 27.[4] Because CHG received the plans on October 27, Lorenz's November 9 e-mail was sent after the five-business-day objection window. Again, CHG's argument that Lorenz's November 9, 2016, e-mail was simply an exercise of its contractual rights is unpersuasive.

CHG next contends that Lorenz's November 9, 2016, e-mail was "not so 'positive,' 'unequivocal,' or 'certain' that CHG would not perform." CHG relies on the following excerpt from American Jurisprudence 2d to support its argument:

> It must be reasonably certain that the promisor will not perform in a timely manner. A party's intent not to perform may not be implied from doubtful or indefinite statements whether performance may take place . . . . Thus, a threat to abandon contract obligations or a mere assertion that one will be unable or will refuse to perform is not sufficient.

17A AM. JUR. 2D Contracts § 692 at 674 (2016) (footnotes omitted). But another section of American Jurisprudence 2d more specifically addresses the scenario where, as here, the claim of repudiation is based on a demand for modifications to the agreement:

> An anticipatory breach must be an unequivocal repudiation; thus, a mere request for negotiations to change the terms of the contract or to cancel it is not sufficient. To constitute an anticipatory breach based upon a request for a modification of terms, *the request must be coupled with an absolute refusal to perform unless the request is granted.*

17A AM. JUR. 2D Contracts § 696 at 677 (2016) (emphasis added) (footnotes

---

[4] For this reason, any dispute about whether the Dropbox account was updated on November 1 or November 2 is immaterial.

omitted).

Here, CHG not only requested to negotiate a price reduction for the Property but also coupled its proposed price reduction with an unequivocal statement that it would terminate the PSA unless Harty Group agreed to the reduction. This was a repudiation, and CHG's arguments that Lorenz was merely making an "offer" or "proposal" are not persuasive.

As a final matter, CHG argues that this court should not limit its focus to Lorenz's November 9, 2016, e-mail. CHG urges us to consider the communications that followed that e-mail, arguing that the court must consider this "surrounding background" in determining whether CHG repudiated. Specifically, CHG points to a December 12, 2016, letter from CHG's counsel to Harty Group's counsel listing various approvals that remained outstanding. CHG also refers to Lorenz's declaration testimony that "CHG viewed Harty's assertion that it had fully satisfied its contractual obligations as a breach," and that he and Joudeh had a call on November 9, 2016, but "[t]o my dismay, Mr. Joudeh was unwilling to negotiate a reasonable business solution to move forward in light of Harty's failure to provide all components of the engineering and construction plans per [the Engineering Approval provision]." But Lorenz's November 9, 2016, e-mail was unambiguous: Developing the Property would cost more than CHG anticipated, and CHG would terminate unless Harty Group agreed to reduce the purchase price. CHG's after-the-fact assertion through counsel that Harty Group breached the Engineering Approval provision does not create a genuine issue of material fact, see Becker, 165 Wn. App. at 245-46 (party may not rely on

14

argumentative assertions to defeat summary judgment), and neither does the fact that Harty Group and its counsel engaged in efforts to salvage the transaction after November 9. And finally, Lorenz's subjective but uncommunicated belief that his e-mail was a "reasonable business solution" to a perceived breach does not create a genuine issue of material fact, particularly where CHG has pointed to no evidence in the record that CHG told Harty Group, before repudiating, that it believed Harty Group was in breach based on Joudeh's October 27, 2016, e-mail. See 17A AM. JUR. 2D Contracts § 692 at 673-74 (promisor's uncommunicated subjective intent not relevant to whether repudiation occurred).

Simply put, where CHG unambiguously cited increased costs as its sole reason for terminating, it cannot create a genuine issue of material fact by attempting to justify that termination after the fact by arguing that Harty Group breached. Pearce v. Puget Sound Broad. Co., 170 Wash. 472, 481, 16 P.2d 843 (1932) ("[W]hen one party terminates a contract for an express reason, he cannot thereafter sustain his action by specifying another breach not referred to at the time, but which, if referred to, could have been cured.").

*Attorney Fees and Costs*

Harty Group requests attorney fees and costs on appeal under the PSA, which provides: "In any litigation or other proceeding arising out of this Agreement, the substantially prevailing party shall be entitled to an award of its reasonable attorneys' fees and other costs incurred therein." Where a contract "specifically provides that attorneys' fees and costs, which are incurred to enforce

15

the provisions of such contract . . . , shall be awarded to one of the parties, the prevailing party . . . shall be entitled to reasonable attorneys' fees in addition to costs and necessary disbursements." RCW 4.84.330. This entitlement applies on appeal. Reeves v. McClain, 56 Wn. App. 301, 311, 783 P.2d 606 (1989). Because Harty Group is the prevailing party on appeal, we award Harty Group its reasonable attorney fees and costs on appeal subject to its compliance with RAP 18.1(d).

We affirm.

_____
J.

WE CONCUR:

_____        _____
J.                              J.