**FILED**
**APRIL 21, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| GRANT COUNTY PORT DISTRICT NO. 9, PORT OF EPHRATA, | ) ) ) | No. 31673-4-III |
| Respondent, | ) ) | |
| v. | ) ) | |
| WASHINGTON TIRE CORPORATION, a Washington Corporation, | ) ) ) | OPINION PUBLISHED IN PART |
| Appellant, | ) ) | |
| CHICAGO TITLE COMPANY OF OREGON, an Oregon corporation, | ) ) ) | |
| Defendant. | ) | |

LAWRENCE-BERREY, J. — Grant County Port District No. 9 (the Port) and

Washington Tire Corporation (WTC) entered into an earnest money agreement (EMA).

Under this agreement, WTC agreed to purchase real property from the Port. Shortly

before closing, the Port commissioners voted to terminate the agreement. The trial court

granted summary judgment in favor of the Port, concluding that the Port was entitled to

repudiate the agreement. The trial court also held that WTC's exclusive remedy under the

EMA for the Port's breach was rescission and return of its $40,000 earnest money. We hold that the Port was not entitled to repudiate the agreement and that the EMA does not provide the exclusive remedy for the Port's breach. We therefore reverse the trial court and remand for further proceedings.

## FACTS

As this is an appeal from summary judgment orders favoring the Port, we set forth the facts in the light most favorable to WTC, the nonmoving party.

WTC's principal, Abraham Hengyucius (Abraham), was born in China and earned a PhD from Nanjing University in China. In about 2005, Abraham formed American Tire Corp., a New Jersey corporation to develop and deliver giant off-the-road (OTR) tires. OTR tires are expensive, industrial-sized tires used on large vehicles, primarily in the mining industry.

In about November 2007, the Seattle Office of the Washington State Department of Community Trade and Economic Development wrote to Abraham to discuss a potential facility in Washington. In 2007 and 2008, Abraham visited Washington to view potential sites for a manufacturing facility, including a site off of Interstate 90 in Grant County.

2

In July 2008, Abraham formed WTC as the entity responsible for developing the new OTR tire plant in Washington. In 2009, Abraham formed Washington Investment & Development, LLC (WID), which started working to identify and obtain commitments from investors wishing to obtain an EB-5 visa. Such a visa allows foreign nationals who invest significant sums in the United States to obtain a green card. WID procured several investors to invest in a proposed tire facility in Washington. WTC also engaged Scott Fraser of GVA Kidder Mathews to act as a buyer's broker on its behalf. Mr. Fraser assisted in determining WTC's operational needs, and traveled with Abraham toward locating an appropriate manufacturing site in Washington.

In August 2008, Mr. Fraser and Abraham visited a 96-acre site located in Ephrata, which was owned by the Port. WTC concluded that this location was a good fit for its planned tire manufacturing facility. Mr. Fraser submitted an offer to purchase the property on WTC's behalf, including a proposed purchase and sale agreement. The Port proposed its own contract and, on October 1, 2008, Abraham executed the EMA. The EMA contemplated a number of conditions which were required to be met prior to closing. WTC deposited $40,000 into escrow.

In furtherance of satisfying these conditions, Abraham, on behalf of WTC, met with various government agencies, including the Governor's Office of Regulatory

Assistance, Grant County public utility district, Grant County economic development council (EDC), city of Ephrata officers, and several Port officers. WTC retained Columbia Northwest Engineering and environmental professionals to finalize off-site infrastructure, water, sewer, and air studies. WTC worked with the Department of Ecology in Spokane to discuss environmental, waste water, and air permit issues, and the Port required that WTC process all studies necessary to obtain Federal Aviation Administration (FAA) approval of the land transaction. In July 2009, WTC completed and submitted a 30-year traffic study. In December 2009, WTC provided the Port with a 254-page report relating to environmental issues.

In January 2010, WTC arranged for its investors to visit Port officials and the surrounding area. In March 2010, the Port's manager, Michael Wren, visited China to meet with WTC's investors. This meeting was arranged at WTC's cost and expense. During the meeting, Mr. Wren was introduced to a number of Chinese people and was made aware of the Chinese custom of Chinese people using Americanized names when working with people in the West. In May 2010, WTC similarly arranged for Washington state senators to visit China in support of WTC's investment in Washington.

On July 20, 2010, Mr. Wren notified WTC that the Port had received the Land Release Notification from the FAA. WTC responded by accepting the conditions of the

land sale transaction. By doing so, WTC satisfied all of its conditions under the EMA. The Port was responsible for completing the two tasks remaining before the sale could close: (1) clear title relating to easements, and (2) obtain a single tax identification number for the parcel.

In late July 2010, WTC arranged another meeting and presentation for investors to visit the property. The program included a slot for Abraham to speak. On August 2, 2010, Abraham provided Grant County EDC with the visitors' legal names, including his own Chinese name. In the e-mail, Abraham requested that "'Regarding the agenda, please kindly change my name to Jacqueline Zhn=ang (sic) for the presentation.'" Clerk's Papers (CP) at 319. The Port apparently concluded that Abraham intended to make the presentation under a different name (Jacqueline Zhang). Abraham subsequently clarified to Terry Brewer and the Port that "'[Ms.] Zhang is a lady responsible for EB-5 marketing'" and that "'Hengyu Zhang is my Chinese name'" and "'Abraham is my American name.'" CP at 319. The Port immediately requested that the FAA delay the land transfer documentation being prepared for the impending closing.

On August 4, 2010, Mr. Wren wrote to Abraham stating that he did not want the name issue "'to get blown out of proportion'" but that he was "'tasked by [the Port's] commissioners to get some clarification so that we can continue to support [WTC].'"

CP at 319 (alterations in original). In the e-mail, Mr. Wren noted the common cultural practice of using a western name: "'After being in China myself, I understand how common the use of American names is, however, can you please show me something (fax) that shows your legal name to include Abraham, since that is what you've signed all of the documents by?'" CP at 319. Mr. Wren indicated that the Port would not move forward without this information.

On August 6, 2010, WTC provided copies of Abraham's identification showing his Chinese name and made clear that Abraham Hengyucius is his American name. On August 13, 2010, Mr. Wren sent Abraham a letter from the Port's legal counsel, Kathryn Kennison. In the letter, Ms. Kennison acknowledged the nearly two years of progress on the project that WTC had performed to satisfy the conditions prior to closing, resulting in the Port finally obtaining FAA approval to close. Ms. Kennison wrote, "'Before proceeding any further with closing this transaction, the Port will require certification from a Washington attorney known to myself who deals extensively in commercial transactions which established the legitimate incorporation of Washington Tire Corporation, and the legal authority of "Abraham Hengyucious" [sic] to bind Washington Tire Corporation as its President.'" CP at 320 (alterations in original).

6

WTC provided the Port with its articles of incorporation and certificate of incorporation. Abraham also offered to execute any and all documents the Port might require to resolve the Port's concerns. Abraham used his American name on the articles of incorporation in which he signed as "Incorporator," and he also was identified on the Secretary of State's website as the chairman of WTC. CP at 337.

On August 27, 2010, Abraham legally changed his name from Hengyu Zhang to Abraham Hengyucius. Abraham provided the Port with a copy of the Pierce County District Court's Order Changing Name, filed on August 27, 2010. In addition, WTC had its broker—Mr. Fraser—go to Ephrata to meet with the Port, and he offered to have WTC execute whatever replacement documents may be required to further clarify Abraham's authority to execute documents as Abraham Hengyucius on behalf of WTC.

Although the Port received documentation and assurances from WTC on the issues it deemed important, it did not timely receive the "certification from a Washington attorney known to [the Port's attorney] who deals extensively in commercial transactions" verifying Abraham's authority. CP at 253. On September 20, the Port commissioners voted to terminate the EMA based on "unresolved issues regarding WTC['s] corporate status and Mr. Hengyucius' [Zhang] authority to sign on behalf of WTC." CP at 140. The Port soon after brought this declaratory action, seeking to have the court declare that

WTC breached the EMA by failing to give adequate assurances, or, alternatively, that WTC's exclusive remedy for the Port's breach was return of its $40,000 earnest money deposit. WTC counterclaimed for specific performance or, alternatively, damages under theories of restitution and promissory estoppel. WTC also counterclaimed for rescission and return of its earnest money, but later chose not to pursue this relief.

In the first summary judgment proceeding, the trial court held as a matter of law that WTC anticipatorily breached the EMA by failing to give adequate assurances, and this failure allowed the Port to repudiate the EMA. The trial court dismissed all of WTC's counterclaims except promissory estoppel. In the second summary judgment proceeding, the trial court held as a matter of law that WTC was not entitled to damages under promissory estoppel; but, rather, its exclusive remedy under the EMA was a refund of its $40,000 earnest money deposit. The trial court ordered the return of WTC's earnest money, less the Port's reasonable attorney fees, costs, and expenses as provided under the EMA. WTC appealed the trial court's summary judgment orders.

## ANALYSIS

This court reviews summary judgment orders de novo. *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 270, 208 P.3d 1092 (2009). When reviewing summary judgment orders, the appellate court engages in the same inquiry as the trial court,

8

viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Riojas v. Grant County Pub. Util. Dist.*, 117 Wn. App. 694, 697, 72 P.3d 1093 (2003). Summary judgment is appropriate only if the moving party can show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton Condo. Apartment-Owners Ass'n v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990).

The burden is on the moving party to show an absence of an issue of material fact. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the moving party submits adequate affidavits to meet its burden, the burden shifts to the nonmoving party to set forth specific facts to rebut the moving party's contentions and show that a genuine issue of material fact exists. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). The nonmoving party may not rely on speculation or argumentative assertions to defeat summary judgment. *Id.*

Summary judgment on the interpretation of a contract is "proper where 'the parties' written contract, viewed in the light of the parties' other outward objective manifestations, has only one reasonable meaning.'" *Spradlin Rock Prods., Inc. v. Pub. Util. Dist. No. 1 of Grays Harbor County*, 164 Wn. App. 641, 655, 226 P.3d 229 (2011)

(quoting *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 9, 937 P.2d 1143 (1997)).

The interpretation of an unambiguous contract is a question of law that we review de

novo. *Stranberg v. Lasz*, 115 Wn. App. 396, 402, 63 P.3d 809 (2003).

Paragraph 9 of the EMA provides:

**ENFORCEMENT:** If title is insurable and all other terms of the Agreement are satisfied, and *Purchaser refuses to complete purchase*, then the earnest money shall be forfeited to Seller as liquidated damages. If *Seller refuses to complete the sale* then Purchaser shall be entitled to rescission of this Agreement and return of its earnest money.

CP at 26 (bold in original) (emphasis added).

The Port has two alternative arguments. The first argument is that WTC

repudiated the purchase and sale agreement by failing to give adequate assurances that it

would perform. Under this theory, WTC is in breach, and the remedy provision

applicable to purchaser's breach needs to be reviewed. The second argument is that it,

the Port, breached the purchase and sale agreement when it refused to proceed with the

closing. Under this theory, the Port is in breach, and the remedy provision applicable to

seller's breach needs to be reviewed. We begin by determining whether the evidence,

taken in the light most favorable to WTC, supports the Port's repudiation argument; and,

if so, whether the doctrine of anticipatory repudiation applies in the context of a purchase

and sale of real property.

A.	*Whether WTC repudiated the EMA*

WTC challenges the trial court's finding that it repudiated the EMA as a matter of law. A party's anticipatory repudiation of a contract excuses the other party's performance. *CKP, Inc. v. GRS Constr. Co.*, 63 Wn. App. 601, 620, 821 P.2d 63 (1991). Such repudiation must occur before the other party's performance is due. *Wallace v. Kuehner*, 111 Wn. App. 809, 816, 46 P.3d 823 (2002). "An intent to repudiate may be expressly asserted or circumstantially manifested by conduct." *CKP*, 63 Wn. App. at 620. The repudiation must consist of a "'positive statement or action by the promisor indicating distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations.'" *Wallace Real Estate Inv. Inc. v. Groves*, 124 Wn.2d 881, 898, 881 P.2d 1010 (1994) (quoting *Olsen Media v. Energy Scis., Inc.*, 32 Wn. App. 579, 585, 648 P.2d 493 (1982)). A party's "doubtful and indefinite statements" suggesting only that it may not perform do not demonstrate repudiation. *Wallace Real Estate*, 124 Wn.2d at 898.

*Restatement (Second) of Contracts* § 251 (1981)—which sets forth the doctrine of anticipatory repudiation by failing to give adequate assurances—provides:

> (1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach[,] the obligee may demand adequate assurance of due

11

performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

While this *Restatement* has been adopted for the sale of goods in RCW 62A.2.-609 and RCW 62A.2.-610, the *Restatement* and doctrine of adequate assurances has not yet been accepted for general application. Even if we were to find the doctrine applicable to real estate transactions, the doctrine does not support the Port's position.

Nothing in the record supports the Port's argument that WTC would not perform. For two years, WTC committed itself toward fulfilling, *and did fulfill*, all of the conditions of the EMA. When the Port questioned WTC about WTC's corporate status and Abraham's authority, Abraham and WTC's broker provided the Port with documentation of WTC's corporate status and Abraham's authority. Both Abraham and WTC's broker assured the Port of its desire to move forward and close the transaction, offering to sign whatever documents the Port deemed necessary.

Moreover, regardless of Abraham's authority, WTC clearly ratified the EMA over the two-year period it performed under the EMA. The corporate principal may impliedly ratify the unauthorized contract of an officer agent. *Barnes v. Treece*, 15 Wn. App. 437, 443, 549 P.2d 1152 (1976). There is no evidence that WTC sought to rescind the EMA.

Rather, WTC consistently sought to close the transaction, and closing was prevented solely by the actions of the Port. The trial court erred in declaring that WTC anticipatorily breached the EMA.

B.      *Whether the EMA limits WTC's remedy to return of its earnest money*

WTC contends that the trial court erred by construing the EMA as providing an exclusive remedy of return of its earnest money for the Port's breach. WTC contends that the EMA does not limit its remedies, and that it may seek specific performance or damages.

Washington follows the objective manifestation theory of contracts, looking for "the parties' intent by its objective manifestations rather than looking at the parties' unexpressed subjective intent." *Paradiso v. Drake*, 135 Wn. App. 329, 336, 143 P.3d 859 (2006). Courts should consider "only what the parties wrote, giving words in a contract their ordinary, usual, and popular meaning unless the agreement, as a whole, clearly demonstrates a contrary intent." *Id.* Courts interpret what was written rather than intended to be written. *J.W. Seavey Hop Corp. v. Pollock*, 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944).

If a contract is subject to two interpretations, then the contract must be "interpreted as to preserve the rights of all the parties, rather than be interpreted in such a way to

13

destroy the rights of either one." *Asia Inv. Co. v. Levin*, 118 Wash. 620, 628, 204 P. 808 (1922). Unless parties to a contract clearly and definitely decide to limit their rights, courts will not interpret contract language to have that effect. *Id.*

The sentence of the EMA relating to seller's breach provides: "If Seller refuses to complete the sale then Purchaser shall be entitled to rescission of this Agreement and return of its earnest money." CP at 26. The EMA does not contain express language excluding the right to damages or specific performance.

*Paradise Orchards General Partnership v. Fearing*, 122 Wn. App. 507, 94 P.3d 372 (2004) controls the disposition of this issue. There, an earnest money agreement provided that in the event of buyer's default, the seller "'shall have the right'" to repossess the property and "'shall have the right'" to sell the apple crop and keep the proceeds. *Id.* at 518. The agreement further provided that the seller "'shall have no obligation'" to refund the earnest money deposit. *Id.* The court held:

> By using the clauses "shall have the right" and "shall have no obligation" the paragraph unambiguously implies that the buyer has discretion to invoke the enumerated remedies. In other words . . . the agreement does not specify mandatory and exclusive remedies. Rather, it reserves the seller's right to invoke the enumerated remedies. No language in the agreement states the remedies are exclusive.

*Id.*

Similarly here, the operative language states that if seller refuses to perform, then buyer "shall be entitled" to rescission and return of its earnest money. As in *Paradise Orchards*, this language unambiguously implies that the buyer has discretion to invoke, *or not to invoke*, the enumerated remedies.

The Port cites *Torgerson v. One Lincoln Tower, LLC*, 166 Wn.2d 510, 210 P.3d 318 (2009), in support of its position that the remedy provision in the EMA, quoted above, provides an exclusive remedy. That case is factually distinguishable. There, the remedy provision stated in relevant part, "'[A]ny default by Seller under this Agreement . . . shall enable Buyer, *as its sole and exclusive remedy*, to terminate this Agreement and recover from Seller the portion of the Deposit paid by Buyer.'" *Id.* at 515 (alterations in original) (emphasis added). As noted above, there is no similar "exclusive remedy" language in the EMA.

The Port next cites *United Glass Workers' Local No. 188 v. Seitz*, 65 Wn.2d 640, 399 P.2d 74 (1965) and contends that the exclusive remedy presumption for foreseeable conditions applies to the EMA. In *United Glass Workers*, the union fined its member for working behind an authorized picket line. *Id.* at 641. The constitution of the plaintiff union provided for the imposition of fines on members for infraction of union rules. *Id.* The constitution further provided in relevant part, "'In the event of non-compliance with

the decision handed down . . . the member . . . shall stand suspended from all privileges of [union membership] until . . . the decision ha[s] been complied with.'" *Id.* at 641-42. When the member refused to pay the fine, the union brought suit. The member moved to strike the complaint. The trial court treated the motion as one for summary judgment. The trial court granted the member's motion, concluding that the constitution provided the exclusive remedy for nonpayment of the fine, i.e., expulsion from the union. *Id.* at 641. On appeal, the union argued that it had the option of expelling the member or collecting the fine. *Id.* Our high court disagreed and held:

> [W]hen parties to a contract foresee a condition which may develop and provide in their contract a remedy for the happening of that condition, the presumption is that the parties intended the prescribed remedy as the sole remedy for the condition, and this presumption is controlling where there is nothing in the contract itself or in the conditions surrounding its execution that necessitates a different conclusion.

*Id.* at 642. This rule has repeatedly been applied to construction cases where the parties foresaw change orders or weather-related delays, and provided specific remedies for such foreseen conditions. *See, e.g., F.S. Jones Constr. Co. v. Duncan Crane & Rigging, Inc.*, 2 Wn. App. 509, 468 P.2d 699 (1970); *Donald B. Murphy Contractors, Inc. v. State*, 40 Wn. App. 98, 696 P.2d 1270 (1985); *S.L. Rowland Constr. Co. v. Beall Pipe & Tank Corp.*, 14 Wn. App. 297, 540 P.2d 912 (1975).

As noted in *United Glass Workers*, the exclusive remedy presumption is controlling unless (1) the contract itself or (2) the conditions surrounding its execution necessitates a different outcome. *United Glass Workers*, 65 Wn.2d at 642. Here, the contract itself necessitates a different outcome. As noted in *Paradise Orchards*, the contract clause "shall have the right" "unambiguously implies that [the nonbreaching party] has discretion to invoke [or not invoke] the enumerated remedies." *Paradise Orchards*, 122 Wn. App. at 518. On this basis, *United Glass Workers* is distinguished.

Moreover, the conditions surrounding the contract's execution necessitate a different outcome. Here, the parties knew that WTC would spend considerable time and money toward complying with the EMA conditions. To conclude that the parties foresaw that the seller would breach and intended nothing but return of WTC's own deposit would allow the Port to commit a breach without consequence, despite WTC's anticipated expenditure of significant resources of time and money. Parties do not enter into contracts to allow one party to breach without consequences. Such a construction is unreasonable, and courts must avoid construing contracts in a way that leads to absurd results. *City of Tacoma v. City of Bonney Lake*, 173 Wn.2d 584, 593, 269 P.3d 1017 (2012) (To avoid an absurd result, the court construed the contract so a contracting party had a remedy against a breaching party.). We, therefore, hold that the exclusive remedy

17

presumption does not apply here when its application would allow a party to breach the contract without consequences.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

C.    *Whether WTC's promissory estoppel claim was properly dismissed*

WTC challenges the trial court's order dismissing its claim for promissory estoppel. To establish a claim for promissory estoppel, a plaintiff must show five elements: "'(1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position

(4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.'" *Farm Crop Energy, Inc. v. Old Nat'l Bank of Wash.*, 109 Wn.2d 923, 939, 750 P.2d 231 (1988) (quoting *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967)). Promissory estoppel is an alternative theory of liability based on the absence of an express agreement. *Tradewell Group, Inc. v. Mavis*, 71 Wn. App. 120, 130, 857 P.2d 1053 (1993). The doctrine of promissory estoppel

addresses situations where consideration is lacking. *Id.* (quoting *Hatfield v. Columbia Fed. Sav. Bank*, 57 Wn. App. 876, 885, 790 P.2d 1258 (1990)).

The trial court correctly dismissed WTC's claim for promissory estoppel. The EMA was an express agreement backed by consideration. As previously stated, WTC's promise to buy and submission of earnest money was given in return for the Port's promise to sell, a promise we construe as having consequences. There was mutual consideration for this promise. The trial court correctly dismissed WTC's promissory estoppel claim.

D.   *Whether the Port must refund the money paid by WTC pursuant to the reversed summary judgment order*

WTC requests that this court require the Port to refund the money the Port received as attorney fees and costs should we reverse the first summary judgment order. Because we conclude that the first summary judgment order was erroneous, we agree with WTC. WTC is entitled to a refund of the money it paid to the Port.

E.   *Whether either party is presently entitled to an award of attorney fees, costs, and expenses on appeal*

The parties each request an award of attorney fees, costs, and expenses pursuant to the EMA. The EMA provides for an award of reasonable attorney fees, and all costs and expenses to the prevailing party. The parties' requests are premature because such an

19

No. 31673-4-III
*Grant County Port. Dist. v. Wash. Tire Corp.*

award must abide the ultimate outcome of this litigation. *See MRC Receivables Corp. v. Zion*, 152 Wn. App. 625, 631, 218 P.3d 621 (2009). At the conclusion of the proceedings below, the trial court has authority to award the prevailing party reasonable attorney fees, costs, and expenses, both at the trial court level, and for this appeal.

In conclusion, we reverse the summary judgment orders, hold that WTC did not anticipatorily breach the EMA, and that the EMA does not provide an exclusive remedy for the Port's breach.

_____
Lawrence-Berrey, J.

WE CONCUR:


_____
Brown, A.C.J.


_____
Korsmo, J.

20