# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| KEN HATCH and CATHI HATCH, husband and wife, and the marital community composed thereof, | ) ) ) | No. 74510-7-I |
| | ) | DIVISION ONE |
| Appellants, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| CARY FALK, | ) ) ) | |
| Respondent. | ) | FILED: June 19, 2017 |

SCHINDLER, J. — Ken and Cathi Hatch (collectively, Hatch) appeal summary judgment dismissal of the lawsuit against Cary Falk to recover the real estate purchase and sale agreement (REPSA) earnest money. We affirm dismissal of the lawsuit.

REPSA

Falk owned a house in Woodinville. In 2014, Falk listed the house for sale with Skyline Properties Inc. On October 29, 2014, Hatch made an offer through Coldwell Banker Bain real estate agent Toni Hoffman to purchase the house for $1,050,000. On November 6, Falk submitted a counteroffer for $1,156,000. Hatch accepted the counteroffer.

On November 7, Hatch and Falk entered into a REPSA. The REPSA states that Hatch will pay Falk the purchase price at the closing scheduled on January 5, 2015, and

Falk will convey title by statutory warranty deed. Under the terms of the REPSA, Hatch agreed to deposit $35,000 in earnest money with his real estate agent.

The liquidated damages provision of the REPSA states that if Hatch "fails, without legal excuse, to complete the purchase of the Property," the earnest money "shall be forfeited to the Seller." The REPSA states, in pertinent part:

> **Default.** In the event Buyer fails, without legal excuse, to complete the purchase of the Property, then the following provision . . . shall apply:
>
> i.     **Forfeiture of Earnest Money.** That portion of the Earnest Money that does not exceed five percent (5%) of the Purchase Price shall be forfeited to the Seller as the sole and exclusive remedy available to Seller for such failure.

On November 11, Hatch delivered a $35,000 check for the earnest money to Hoffman and Coldwell Banker Bain.

After inspections of the house, Hatch requested a $17,000 reduction in the purchase price. In a November 23 e-mail to Hoffman, Falk agreed to reduce the purchase price on condition that Hatch either release $20,000 of the earnest money and agree to a December 5 closing date or release the entire $35,000 in earnest money and keep the January 5, 2015 closing date. The November 23 e-mail states the agreement to the $17,000 reduction in the price is "subject to" Hatch agreeing to one of the two following options:

> a.     That the $20,000 be released non-refundable upon acceptance of this concession as previously agreed and that [Hatch] close on the house by December 5th or;
>
> b.     That [Hatch] release, non-refundable, the entire $35,000 earnest money upon acceptance of this concession.
>
> [Hatch] want[s] to insure [he is] getting funds to have a perfect house. The seller, me, wants to insure that the house will close as agreed.
> If either of the two options above are agreeable to [Hatch], [my real estate

2

agent] or you can write up the necessary paperwork and I will sign it.

On November 24, Hoffman sent Falk an e-mail informing him that in exchange for a reduction in the purchase price and keeping the January 5 closing date, Hatch agreed to release the $35,000 in earnest money. Later that same day, Hoffman sent an e-mail to Hatch with an "Inspection Response for Form 35" (Inspection Response Form). The Inspection Response Form states, in pertinent part:

> Purchase price shall be $1,139,000.    Seller to provide access to property until close date
> Earnest monies of $35,000 to be released to seller, non refundable to buyer, once inspection response is agreed upon.

Hatch signed the Inspection Response Form. Coldwell Banker Bain released the earnest money deposit of $35,000 to Falk.

In late December, Hatch told Hoffman that he was not able to get a loan and wanted to talk to Falk "[a]bout a lease purchase." At 2:47 p.m. on December 26, Hoffman sent Falk an e-mail. The e-mail states Hatch "would like to speak with [y]ou directly about the purchase of the house" and asks for Falk's phone number.

> Q.    You're asking for his phone number and you state that, "[Hatch] would like to speak to you directly about the purchase of the house." What specifically, if you know, did [Hatch] want to speak to Mr. Falk about?
> A.    About a lease purchase.
> Q.    Why did he want to speak about a lease purchase?
> A.    Because he wasn't getting a loan through Banner Bank.
> Q.    How do you know he wasn't getting a loan through Banner Bank?
> A.    Because he told me that.

According to Hoffman, after she sent the e-mail at 2:47 p.m. on December 26, Falk called her.

> Q.    Did you express to Mr. Falk or his wife, who was his

agent, that [Hatch] couldn't get a loan?

A.    Yes.

Q.    What did you tell them?

A.    I had sent an e-mail to [Falk] telling him that Ken Hatch wanted to speak with him, and not referencing why, and could I give him his phone number?

And [Falk] at that time called me and said basically, "What's the matter? Can't he close?" And I said, "He'd like to talk to you about a lease purchase."

And [Falk] said, "No offense. I'm sure he's a really nice guy, but I don't want to talk to him about anything other than closing my house."

Hoffman later testified that she was "not certain" she told Falk during the December 26 phone conversation that Hatch "couldn't get a loan."[1] But Hoffman testified she believed it was "clear" to Falk on December 26 that Hatch could not get a loan, and Falk told her he was not interested in discussing a lease purchase.

On December 27, Hatch sent an e-mail to Hoffman asking her to find a "high end luxury home" to rent with a "minimum of 4,000 square feet." That same day, Hoffman told Falk that Hatch was not going to purchase the house. At 12:59 p.m. on December 27, Hoffman sent Hatch a "release form." The e-mail states Falk "would like it as soon as possible so that he can get his house back on the market."

The closing on the house scheduled for January 5, 2015 did not occur.

Lawsuit for Earnest Money

On May 11, 2015, Hatch filed a lawsuit to recover the $35,000 in earnest money. The complaint asserts that "[i]n accordance with the terms of the Agreement," Coldwell

---

[1] Hoffman testified, in pertinent part:

Q.    And you said [Falk] asked you "Can't he close?" Is that what he asked?

A.    You know, and kind of backing up to my previous answer about telling him that he couldn't get a loan, I'm not certain I ever said those words to [Falk]. I believe I said, "He'd like to talk to you about a lease purchase."

Q.    Why were you asking about a lease purchase?

A.    Because I'd been told they couldn't get a loan.

Q.    Did . . . Falk, specifically ask if they could get a loan?

A.    I don't believe so.

4

Banker Bain released the $35,000 earnest money deposit to Falk. Hatch alleged that because neither party tendered performance on the January 5, 2015 closing date, the REPSA "terminated by its terms," and Hatch was entitled to recover the earnest money.

Falk filed a motion for summary judgment dismissal of the lawsuit. Falk argued Hatch repudiated the agreement before the closing date and therefore, he had no duty to tender performance. Falk asserted the undisputed evidence established Hatch did not comply with the terms of the REPSA and under the liquidated damages provision, he was entitled to retain the earnest money.

In support, Falk submitted a copy of the REPSA, a number of e-mails, and excerpts from the deposition testimony of Hoffman. Hatch did not move to strike Hoffman's deposition testimony or any of the other evidence Falk submitted in support of his motion for summary judgment.[2] Hatch submitted no evidence in opposition to Falk's motion for summary judgment.

Hatch filed a cross motion for summary judgment. Hatch argued that because neither party tendered performance on the January 5 closing date, as a matter of law the REPSA "expired" and Falk was not entitled to retain the earnest money. Hatch conceded that if he repudiated before the closing date, Falk's "performance was excused, and [Falk] is entitled to the earnest money." But Hatch argued there was no evidence of a clear or unequivocal "statement or action" that he repudiated the REPSA before the January 5, 2015 closing date.

The court granted Falk's motion for summary judgment and dismissed the lawsuit. For the first time in a motion for reconsideration, Hatch argued "[q]uestions of fact may be present" as to whether Hoffman's statements to Falk constituted

---

[2] The attorney conceded at oral argument that Hatch did not move to strike the evidence.

repudiation. The court denied the motion to reconsider.

Appeal of Summary Judgment Dismissal

Hatch asserts the court erred in dismissing his lawsuit on summary judgment.[3] Hatch argues that because Falk did not tender performance by delivering the deed on the January 5, 2015 closing date, as a matter of law Falk is not entitled to retain the earnest money under the REPSA. Falk contends the uncontroverted evidence establishes Hatch repudiated the REPSA before the closing date.

We review an order of summary judgment dismissal de novo and engage in the same inquiry as the trial court. Kofmehl v. Baseline Lake, LLC, 177 Wn.2d 584, 594, 305 P.3d 230 (2013). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Kofmehl, 177 Wn.2d at 594. We consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989). But "if reasonable minds could reach only one conclusion from the evidence presented," summary judgment should be granted. Estate of Becker v. Avco Corp., 187 Wn.2d 615, 621, 387 P.3d 1066 (2017), Allen v. State, 118 Wn.2d 753, 760, 826 P.2d 200 (1992).

Where, as here, a defendant files a motion for summary judgment, the defendant bears the initial burden to show the absence of genuine issues of material fact. Young, 112 Wn.2d at 225. If the defendant makes this initial showing, the burden shifts to the

---

[3] Hatch also appeals the order denying his motion for reconsideration. However, Hatch does not assign error to the order or present any argument addressing the order in his briefing. Failure to assign error or provide argument precludes appellate consideration. RAP 10.3(a)(4), (6); Ang v. Martin, 154 Wn.2d 477, 486-87, 114 P.3d 637 (2005) (court will not consider alleged error where appellant does not assign error or present argument or citation to authority pertaining to issue); Riley v. Iron Gate Self Storage, 47905-2-II, 2017 WL 1381911, at *10 (Wash. Ct. App. Apr. 18, 2017) (declining to consider challenge to denial of motion for reconsideration where appellant did not present any argument or supporting authority in his appellate brief).

plaintiff to set forth specific evidence establishing a genuine issue of material fact. Young, 112 Wn.2d at 225 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The plaintiff cannot meet its burden by relying on speculation or "mere allegations, denials, opinions, or conclusory statements" to establish a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004) (citing CR 56(e)); Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988); Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986). If the plaintiff fails to make a showing sufficient to establish the existence of a material issue of fact, summary judgment is proper. Young, 112 Wn.2d at 225.

In a contract for the sale of real estate, payment of the purchase price and delivery of the deed are concurrent obligations. Wallace Real Estate Inv. Inc. v. Groves, 124 Wn.2d 881, 897, 881 P.2d 1010 (1994); Willener v. Sweeting, 107 Wn.2d 388, 395, 730 P.2d 45 (1986); Bendon v. Parfit, 74 Wash. 645, 648, 134 P. 185 (1913). As a general rule, the seller is not entitled to liquidated damages for the buyer's breach of the purchase and sale agreement unless the seller tenders the deed or the buyer repudiates the agreement. Willener, 107 Wn.2d at 395-96; Wallace, 124 Wn.2d at 897-98. If the buyer repudiates the agreement, the seller's failure to "concurrently perform under the purchase and sale agreement" is "irrelevant." Wallace, 124 Wn.2d at 897, 899.

Repudiation "must occur before the other party's performance is due." Grant County Port Dist. No. 9 v. Wash. Tire Corp., 187 Wn. App. 222, 231, 349 P.3d 889 (2015). Repudiation is a " 'positive statement or action by the promisor indicating

distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations.' " Wallace, 124 Wn.2d at 898[4] (quoting Olsen Media v. Energy Scis., Inc., 32 Wn. App. 579, 585, 648 P.2d 493 (1982)); Grant County, 187 Wn. App. at 232; VersusLaw, Inc. v. Stoel Rives, L.L.P., 127 Wn. App. 309, 321, 111 P.3d 866 (2005). " 'An intent to repudiate may be expressly asserted or circumstantially manifested by conduct.' " Grant County, 187 Wn. App. at 231-32 (quoting CKP, Inc. v. GRS Constr. Co., 63 Wn. App. 601, 620, 821 P.2d 63 (1991)); VersusLaw, 127 Wn. App. at 321. But a party's " 'doubtful and indefinite statements' suggesting only that it may not perform do not demonstrate repudiation." Grant County, 187 Wn. App. at 232 (quoting Wallace, 124 Wn.2d at 898). Although repudiation of a contract is generally a question of fact, repudiation may be decided on summary judgment if " 'reasonable minds can reach only one conclusion.' " VersusLaw, 127 Wn. App. at 321 (quoting Alaska Pac. Trading Co. v. Eagon Forest Prods., Inc., 85 Wn. App. 354, 365, 933 P.2d 417 (1997)).

Hatch concedes that if he repudiated the REPSA, Falk is entitled to retain the $35,000 in earnest money. But Hatch contends there is no evidence that he made a clear or unequivocal statement to repudiate or not perform before the closing date. On appeal, Hatch relies on Hoffman's deposition testimony about the December 26 telephone conversation with Falk to argue there is no proof of repudiation. Hatch specifically points to the testimony that although Hoffman did not remember exactly what was said, she believed it was "clear" to Falk that Hatch was not "going to buy the home and close."

> Q. Did you tell [Falk] why you were asking about a lease

---

[4] Internal quotation marks omitted.

purchase?

A. I honestly don't remember every single word of that conversation. I think it was clear that [Hatch] w[as]n't prepared to close on the house and . . . wanted to find an alternative way of purchasing the home.

Q. When you say "w[as]n't prepared to close on the house" what do you mean by "w[as]n't prepared"?

A. Couldn't get the loan that was stated in the contract.

Q. So in your conversation with Mr. Falk, do you feel that that was made clear to him when you spoke with him?

. . . .

[A.] It was clear to him that [Hatch] w[as]n't going to buy the home and close.

Although Hoffman's testimony about the telephone conversation on December 26 does not clearly establish repudiation, the uncontroverted testimony of Hoffman establishes that on December 27, Hoffman unequivocally told Falk that Hatch was "not going to close on the transaction."[5] Hoffman testified that after Hatch instructed her on December 27 to find a house to rent, she told Falk that Hatch was "not going to close on the transaction."

Q. . . . So at this point, this is December 27, 2014, had you been instructed to start searching for rentals?

A. Yes.

Q. Why was it that you were searching for rentals for the Hatch[e]s?

A. Because they weren't going to purchase the Falk home.

Q. How did you know that they weren't going to purchase the Falk home?

A. Because they told me they couldn't get a loan.

Q. At this point in time that they were searching for rentals, were they still under contract with the Falks?

A. Yes.

Q. And had it been expressed to Cary Falk at that point

---

[5] In his reply brief, Hatch argues Hoffman exceeded the scope of her authority by telling Falk that he could not close on the sale of the house. We decline to consider an argument made for the first time in a reply brief. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); In re Marriage of Sacco, 114 Wn.2d 1, 5, 784 P.2d 1266 (1990); Jackson v. Quality Loan Serv. Corp. of Wash., 186 Wn. App. 838, 845, 347 P.3d 487 (2015); Conrad v. Alderwood Manor, 119 Wn. App. 275, 297, 78 P.3d 177 (2003).

that they were not going to close on the transaction?

    A.   Yes.

Because the uncontroverted evidence shows Hatch repudiated the REPSA before the scheduled closing date on January 5, 2015, the court did not err in dismissing the lawsuit to recover the earnest money.

Attorney Fees

The REPSA provides for attorney fees to the substantially prevailing party on appeal. The REPSA states, in pertinent part:

> **ATTORNEYS FEES.** In any dispute related to this Agreement or the Property, regardless of the legal theory upon which any claim is based, the substantially prevailing party shall be entitled to its reasonable attorneys fees and costs incurred prior to, during and in lieu of any proceeding (litigation, meditation, arbitration, bankruptcy, etc.) on appeal and in the collection of any award.

We affirm summary judgment dismissal of the lawsuit to recover the earnest money. Upon compliance with RAP 18.1, Falk is entitled to an award of reasonable attorney fees on appeal.

WE CONCUR:

10