[No. 10927. Department Two. July 1, 1913.]

## H. M. TAYLOR et al., Appellants, v. G. EWING et al., Respondents.[1]

CONTRACTS—CONSTRUCTION—EVIDENCE—SUFFICIENCY. A settlement agreement between a failing debtor and a trustee for creditors whereby the trustee agreed to get assignments of the claims, held, on conflicting evidence, to cover only merchandise claims, where the debtor's attorney objected to the only claim other than merchandise claims as having been paid and being "for rent."

CONTRACTS—PERFORMANCE OR BREACH. A settlement agreement between a failing debtor and a trustee for creditors whereby the trustee agreed to secure assignments of all merchandise claims, is substantially performed, where it appears that there were claims of more than forty creditors residing in many states aggregating $12,000, and assignments were procured of all claims except one for $366.67 which was procured by wire during the progress of the trial, and one for $48 the amount of which was tendered and paid into court.

CONTRACTS—MUTUALITY. A settlement agreement between a failing debtor and a trustee for creditors is not lacking in mutuality, where it appears that it was agreed that the trustee should obtain assignments of the merchandise claims, and that pending bankruptcy proceedings should be dismissed and the debtor put in possession of the stock of goods, which was done.

Appeal from a judgment of the superior court for Douglas county, Steiner, J., entered September 20, 1912, upon findings in favor of the defendants, in an action on contract, tried to the court. Reversed.

*McClure & McClure, Arthur McGuire*, and *Walter S. Osborn*, for appellants.

*W. J. Canton* and *A. J. Hensel*, for respondents.

MAIN, J.—The purpose of this action is to recover the possession of, and a judgment upon, a promissory note.

The facts are substantially as follows: During the early part of the year 1911, one R. G. Ewing was, and for some

[1]Reported in 132 Pac. 1009.

time prior thereto had been, engaged in the mercantile business, at Withrow, Washington. Becoming financially embarrassed, he executed and delivered to his father, G. Ewing, a chattel mortgage upon his stock of merchandise. Sometime during the month of February of that year, action to foreclose the mortgage was begun, and the store was taken possession of by the sheriff. In the United States district court for the Western District of Washington, bankruptcy proceedings were pending against R. G. Ewing, and a sale under the foreclosure action was enjoined. In addition to the debt to his father, which was secured by the chattel mortgage, he owed numerous creditors who had sold him merchandise. The debts to these various merchandise creditors approximated $12,000. The plaintiffs, Taylor & Dodd, at a meeting of the Seattle Merchants' Association, were appointed as trustees to go to Withrow for the purpose of effecting some adjustment or settlement of R. G. Ewing's affairs. On or about February 24th, after reaching Douglas county and negotiating with G. Ewing and his attorneys, Canton & Hensel, an oral agreement was entered into whereby G. Ewing was to deliver to the Douglas County Bank in escrow his promissory note in the sum of $4,500, due October 1, 1911, with interest at 8 per cent per annum, and payable to the plaintiffs. The plaintiffs were to secure assignments to G. Ewing from the merchandise creditors of R. G. Ewing, and deposit such assignments in the bank above named;. the bankruptcy proceedings were to be dismissed, and G. Ewing was to be permitted to take possession of the store. When the assignments of the merchandise creditors had all been delivered to the bank, the note was to be delivered to the plaintiffs in full payment of the $12,000 merchandise indebtedness of R. G. Ewing.

Immediately after this plan of adjustment was agreed upon, and in pursuance thereof, the plaintiffs entered upon its performance. Before returning to Seattle, they examined the books and papers which had been kept in the store

for the purpose of obtaining a list of the creditors. Subsequently the names of other creditors were furnished to them by Canton & Hensel. Names of creditors were also procured through the agency of mercantile credit associations which exist in many cities. Frequent correspondence occurred between the plaintiffs at Seattle and Canton & Hensel at Waterville. On April 21st the bankruptcy proceedings were dismissed and the store was again opened by G. Ewing. From time to time as assignments were secured from the creditors, they were mailed to the Douglas County Bank. The following are excerpts from letters written by Canton & Hensel to the plaintiff Taylor, with the dates thereof:

April 28th: "We have all the claims except the Armour claim."

July 1st: "Will you please make a new assignment of all the claims of the creditors of R. G. Ewing to G. Ewing as of the date of July 8, 1911. This will take in the Armour claim over which we have so much trouble. Make your assignments general to cover all claims and this will settle everything."

The general assignment referred to in the above letter was executed under date of August 1st and sent to the bank.

July 29th: "We feel very relieved to have this matter closed up as it has been a very tedious affair to us and we desire at this time to assure you that we very much appreciate your businesslike efforts and your general conduct in adjusting this very knotty entanglement and that you have left friends where others would leave enemies."

Sept. 1st: "Yours of 8-28-11 to hand and note the two claims filed with you against the estate of R. G. Ewing. Will say that R. G. Ewing has O. K.'d the Douglas Hardware claim less the interest and has rejected the Cordelier claim. We do not understand why this was sent in. This fellow was paid some time ago in full, this claim being for rent. As to the Sterling Manufacturing Co.'s claim we got the necessary O. K. and filed it with the trustee upon the receipt of the letter with claim enclosed. The record that the bank has is exactly the same as that which you have. After filing the Douglas Hardware account, the total is $11,875.83."

Sept. 20th: "There has been three or four other firms writing Ewing about accounts they hold, all small, and we have instructed him to write them to assign their accounts and send them to you. Before we lift the escrow we want to be sure that all the creditors, or at least about all of them, turn their accounts over to you. . . . Now, Mr. Taylor, the recent rains have prevented the threshing of grain and delayed the marketing of same for about two weeks longer than usual and while if we are satisfied to lift the escrow on October 1st, we can certainly raise the cash to do so and want to do so if absolutely necessary."

Then follows a request for an extension of the note for a period of fifteen or twenty days. Subsequent to this, the correspondence shows that the plaintiffs repeatedly requested payment of the note, and Canton & Hensel repeatedly asked for further time. The matter not being settled, a letter was addressed directly to G. Ewing, and on February 3, 1912, he replied:

"I said you receivers had not gotten all the bills assigned (referring to a conversation) to me yet and I would like very much if you would get them all and have the matter settled. The note calls for all of the creditors. I have settled some of the accounts in order to keep out of litigation. I will not pay the $4,500 note until the bills are all assigned, which they are not at the present time."

On Feb. 20, 1912, the plaintiffs wrote Canton & Hensel:

"While you may consider it 'nervy' on our part to suggest either to Mr. Ewing or his worthy representatives that they use a portion of their valuable time to assist us in getting in the legitimate claims against R. G. Ewing's business, I do not at all consider it so. In explanation of request made that he use his best efforts to forward these claims I can only say that I have received numerous letters from you indicating that there were other claims in existence against R. G. Ewing's estate which we have not received and assigned to Mr. G. Ewing, but although I have repeatedly requested you to give me the names of all such claimants, or any of them, you have persistently refused to divulge either their names or the character of their claims."

The matter not reaching a settlement, some time there-
after this action was begun. The defense was, (1) that the
contract had been rescinded by notice to the plaintiffs; and
(2) that all the claims not having been assigned, no action
could be maintained upon the note. The defendants con-
tended that notice of rescission had been given the plaintiffs
by long distance telephone; and on the question of the claims,
contended that the plaintiffs were to secure assignments,
not only of the merchandise claims, but those of other cred-
itors of R. G. Ewing as well.

The cause was tried to the court without a jury, and the
court found that notice of rescission had been given, and
also that the contract contemplated the assignment not only
of the merchandise claims but of all claims. The court found
that, at the time of the trial, there were three claims which
had not been assigned, the Cordelier claim for rent amount-
ing to $135, the claim of the Washington Cracker Company,
of Spokane, amounting to $366.67, and the claim of the
Garden City Tailoring Company, of Chicago, amounting to
$40.29. It was stipulated upon the trial that, in the event
the plaintiffs recovered, they were entitled to an allowance of
an attorney's fee in the sum of $500. At the conclusion of
the trial, the action was dismissed. The plaintiffs appeal.

The first question presented is: What was the under-
standing between the parties as to whether the appellants
were to secure an assignment of the debts of R. G. Ewing
other than the merchandise accounts? On this question, the
oral evidence of the witnesses for the appellants and the re-
spondents is in conflict; and if it were necessary that the
finding rest upon the oral testimony alone, we would hesitate
to disturb the holding of the trial court. The Cordelier
claim for rent is the only claim other than the two mer-
chandise claims which it was found had not been assigned.
The letter of Canton & Hensel under date of Sept. 1, 1911,
an excerpt from which is above quoted, written prior to the
time any controversy arose, demonstrates that the appel-

lants' position as to the claims other than the merchandise claims must be sustained. It was there said, that the Cordelier claim had been rejected and that they did not understand why it had been sent in as it had been paid in full, "this claim being for rent." If the appellants were to get assignments of claims other than those for merchandise, why should this letter refer to the Cordelier claim as being one for rent in connection with its rejection?

The respondents' second contention is that the appellants could not maintain an action upon the note until all of the merchandise claims were assigned and delivered to the bank; and that, inasmuch as the claims of the Washington Cracker Company and the Garden City Tailoring Company had not been assigned, the action must fail. There can be no question but that the appellants exercised the utmost good faith in their endeavor to carry out the contract and to secure all of the merchandise claims. During the trial, the assignment of the claim of the Washington Cracker Company was secured by wire, and cash to the amount of the Garden City Tailoring Company's claim was tendered and deposited in the registry of the court. Taking into consideration that there were more than forty merchandise creditors, located in numerous towns and cities, with claims aggregating a total of approximately $12,000, and that they were all obtained and assigned with the exception of the two mentioned, we think there was a substantial compliance with the contract. The respondents are in no way prejudiced because two of the claims were not assigned before suit was instituted. Consequently they have no just ground to complain. In cases of this character. the rule is that substantial performance is all that the law requires. The plaintiffs were therefore entitled to maintain their action. In 3 Page on Contracts, § 1385, the rule is stated thus:

"The original common-law rule required a strict and literal performance as a condition precedent to recovery. The modern rule permits recovery without a strict and literal per-

formance if there has been a substantial performance and the contractor has attempted in good faith to perform the contract. If a contract has been performed substantially and deviations from the contract have been made, but not wilfully or in bad faith, the party so performing can recover the contract price, less the amount of damages caused by such deviation. The amount of such damages is usually the expense of completion according to the contract."

See, also, to the same effect: *Drew v. Goodhue,* 74 Vt. 436, 52 Atl. 971; *Morgan v. Gamble,* 230 Pa. 165, 79 Atl. 410. Under the rule of these authorities, the right of the appellants to maintain the action is manifest.

It is finally contended that the contract had been rescinded by notice to the appellants subsequent to January 1, 1912, and prior to the institution of the action. The evidence as to rescission was oral and was in conflict. It will be assumed that the notice of rescission was given as claimed by the respondents. It is claimed by the respondents, in support of the right to a rescission, that the contract was without mutuality. This contention cannot be sustained. The agreement was fairly entered into, and the appellants immediately entered upon its performance in good faith, and procured assignments from all the numerous creditors with the exception of the two named. In addition to this, as a part of the agreement, it was understood that the bankruptcy proceedings would be dismissed. The evidence offered to show that the dismissal of the bankruptcy proceedings was one of the inducing causes for the contract is not very complete; but there is sufficient in the record to show that it was understood that the dismissal of these proceedings was a part of the understanding, and that they were subsequently dismissed. This gives to the contract mutuality. The trial court, when the appellants were seeking to show the facts relative to the dismissal of the bankruptcy proceedings, sustained objections to such testimony. The evidence was obviously competent and should have been admitted. But as already said,

the record, while meager, contains sufficient to show what was actually done.

The respondents in support of their contention that the contract lacked mutuality, cite the case of *Herrin v. Scandinavian-American Bank*, 65 Wash. 569, 118 Pac. 648. In that case there was a contract for the sale of corporate stock for future delivery. An order was drawn upon the bank directing payment when the stock should be deposited therein. Before the tender of the stock the contract was rescinded. That case is plainly distinguishable from the one here presented. Here, prior to the time that the attempted rescission took place, if it did take place, the bankruptcy proceedings had been dismissed; assignments of all claims of the creditors which the appellants were obliged to secure prior to the time they should have the note delivered to them, had been deposited in the bank, with the exception of the two above mentioned. The contract had, in fact, been substantially performed on the part of the appellants several months before the attempted rescission is claimed to have taken place. The right of the appellants to the possession of the note and for a judgment thereon is plain.

The judgment will be reversed, and the cause remanded with direction to the superior court to enter a judgment for the sum of $4,500 on the note, and interest thereon at 8 per cent per annum from its date, and in addition thereto, for an attorney's fee in the sum of $500.

ELLIS, MORRIS, and FULLERTON, JJ., concur.