IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ROBERTA BRUNI, M.D.,<br><br>           Appellant,<br><br>      v.<br><br>UNIVERSITY OF WASHINGTON<br>SCHOOL OF MEDICINE, a<br>Washington public educational<br>institution,<br><br>           Respondent. | No. 82427-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — This case involves a dispute over an offer of employment between Dr. Roberta Bruni and the University of Washington School of Medicine (University) containing multiple conditions precedent to her employment. One condition was for Bruni to complete pre-employment materials "as indicated" in order to receive required credentials and appointments before being approved to work as an employee of the University. After several weeks of not receiving all of Bruni's completed pre-employment materials, the University rescinded its offer. Bruni contends that the University improperly rescinded its offer because she completed some pre-employment materials, the original due dates were waived, and she was not given a chance to complete the remaining materials. Because Bruni did not fulfill the condition precedent, and the University did not waive its requirement that the materials be completed timely, we affirm.

Citations and pin cites are based on the Westlaw online version of the cited material

FACTS

In 2015, the University began its search process to hire a new faculty member who would act as a clinical associate professor in the University of Washington School of Medicine, Department of Pediatrics, and Division of Neonatology. The position included a faculty appointment at the University and responsibilities to treat patients at various facilities, including the University of Washington Medical Center (UWMC), Seattle Children's Hospital (SCH), and St. Joseph Medical Center. The faculty member also would fill the role of medical director of the Neonatal Intensive Care Unit (NICU) at St. Joseph Medical Center, which required high-level administrative and managerial duties.

On February 11, 2016, Dr. Bruder Stapleton, Chair of the University's Department of Pediatrics, reached out to Bruni informing her she would be receiving a written offer via email from the University regarding the position. Dr. Sandra Juul, the Head of the Division of Neonatology, followed up with Bruni over the phone, which Juul regularly did with candidates at this stage of hiring, to discuss the position and start date of July 1. Bruni received an offer letter from Stapleton on February 22, and it stated the following in relevant part:

> We would propose your appointment to the faculty as a full-time Clinical Associate Professor effective July 1, 2016. Your appointment would require the concurrence of several review bodies, including the Department of Pediatrics Appointments and Promotions Committee, the voting faculty of the Department, the School of Medicine Dean and University bodies. This offer is contingent on these approvals.
> . . .
> This is a twelve-month appointment with salary paid over twelve months for eleven months of service. You should not expect to receive a salary increase during the first year of your appointment. Thereafter, you

would be eligible to participate in University faculty salary increases as they occur and within University guidelines. . .

Your appointment will be effective through the last day of the academic year, June 30, 2017. Your appointment will be reviewed for renewal, and in this first year of your appointment, you would be notified no later than March 31 of your renewal for the academic year, July 1, 2017, through June 30, 2018. In following years you will be notified of renewal or non-renewal of your appointment for the following academic year no later than December 31.
. . .

In order for you to begin work and see patients, you must have obtained the following: 1) your license to practice medicine in the State of Washington, 2) a medical staff appointment at Seattle Children's Hospital, the University of Washington Medical Center and St. Josephs [sic] Medical Center Franciscan, 3) a faculty appointment, and 4) membership in the physicians practice plan.

If you accept this offer, you will be provided with credentialing forms that must be completed and returned as indicated. . . .
. . .

If you agree with the conditions of this letter, please indicate by signing your concurrence below and returning it to me by March 15, 2016.
. . .

The purpose of obtaining the requisite medical credentials and faculty appointment is so a University employee is properly vetted in order to care for patients. This process requires potential employees to compile and properly submit all materials as indicated to apply for their medical staff privileges. Individual hospitals give medical staff privileges (credentials) to practitioners when the hospital's individual vetting system is complete. The University's offer required medical staff privileges at the three separate hospitals referenced in the offer letter.

The completed materials go through several rounds of review—a vote by the department faculty, approval by the School of Medicine Dean, approval of the Provost, and approval by the Board of Regents. If candidates fail to submit their complete

3

package of pre-employment materials, the reviewing bodies are unable to commence their reviewing process.

By March 1, Juul reached out to Bruni, because she had not yet heard from Bruni regarding the offer. Bruni responded the same day apologizing and saying she had no questions, and she sent her signed offer letter that same day. On March 9, Marissa Atienza, a University program administrator in the department of pediatrics, provided Bruni with a letter via email that listed the materials she needed to submit to apply for a faculty appointment, including instructions for submitting those materials. In her email, Atienza explained,

> I will be processing your UW[1] academic faculty appointment paperwork with the help of Marie Pasquale from Faculty Affairs. Attached you will find all the forms necessary for this process. The first attachment is a letter from me outlining all the forms due April 1st. Please mail all original forms to Marie Pasquale at Seattle Children?s [sic] Hospital, 4800 Sand Point Way NE, CSB-100 Seattle, WA 98105. It would be greatly appreciated if you could acknowledge receipt of this email. I have also noted materials you will be receiving from other individuals. It is important to keep all information received separate and return to the appropriate person. . . .

In her attached letter, Atienza wrote, "Attached are forms for your faculty appointment in the Department of Pediatrics. Please fill out and return to Marie Pasquale by April 1, 2016." The email both attached multiple forms and provided links to where specific forms could be downloaded. The list included an employment eligibility verification form (I-9) that required Bruni to provide in-person verification by either arranging a convenient time to do so with Pasquale in Seattle "in the very near future" or to have a notary complete the form and for Bruni to also provide copies of her approved identification. The list also included obtaining a Drug Enforcement Administration (DEA)

---

[1] UW refers to the University of Washington.

4

license and three letters of recommendation from current or past institutions. Atienza instructed Bruni that "[r]equests for letters should be addressed and sent . . . by April 1, 2016." The list also described other forms that needed to be completed but would be sent to her separately:

11. Medical Staff application for Seattle Children's Hospital (application will be sent to your home address). Be sure to complete at your earliest convenience. If you delay in returning, this could impact your credentialing start date.
12. UWMC Medical Staff application and privilege forms (application forms will be e-mailed to you directly by the UWMC Office for Medical Staff Appointments). You will be required to take onboarding orientation classes once your faculty appointment is effective. This information will be provided to you closer to your start date and will list the scheduled meeting times.
13. CUMG[2] Provider Enrollment package (will be emailed to you at a later date directly from Krsangi McDonnell at CUMG)

Atienza again alerted Bruni in the letter that "[i]t is important to remember to keep all materials you receive separate and return to the appropriate individual."

Over the next two months, Bruni had to be reminded multiple times to submit her materials.

On March 10, Michelle Siler, administrative assistant of the Medical Staff Office for Franciscan Health System, which includes St. Joseph Medical Center, emailed Bruni the Franciscan application packet.

On March 11, Meileilani Coles, the program manager for the Office of Medical Staff Appointments, sent Bruni a link to an online application for a medical staff appointment to UWMC, informing her that the materials were due within seven days, or March 18.

---

[2] CUMG refers to Children's University Medical Group.

On March 14, Pa Lao, a provider enrollment specialist, emailed Bruni application materials for the University of Washington Physicians Group. Those materials were due in 30 days, or April 13.

On March 28, Atienza emailed Bruni alerting her that her application was due that week. In the email Atienza wrote, "In order for you to be credentialed by July 1st it's important that this information be sent in soon. Also please follow up with your letters of reference to make sure they email, fax or mail their letters to Marie Pasquale."

On April 5, Atienza asked Bruni to notify her when Bruni sends her University packet.

On April 6, when Bruni missed UWMC's deadline, Coles emailed Bruni informing her that her office still had not received her application and to submit it "as soon as possible."

On April 7, Dr. Linda Wallen wrote to Bruni stating, "It is urgent that you submit the paperwork for credentialing at UWMC. If this paperwork is not submitted it is possible that your start date may need to be delayed."

On April 11, Atienza emailed Bruni, "Can you please give me an update on your application for UW and SCH. Your packets are 11 days late and we might have to delay your start date without pay until your credentialing is approved."

On April 15, Juul wrote to Bruni, "I have been apprised that you have not yet sent in the necessary paperwork for credentialing purposes. Please take care of this immediately, or let me know why you cannot do so."

A little before midnight on April 17, Bruni emailed Wallen explaining that she realized time is of the essence, but she was trying to make sense of multiple sets of

applications while working 21 days in a row, and she had sent some parts and was doing her best. Bruni also wrote that her current employer was asking her to work July 1 through July 3, and that she would be coming up to Seattle "after 7/4, and start getting oriented, regardless of when I will be able to be officially on service. I hope it all works out." Five minutes later, Bruni emailed Atienza saying she tried to fax the Franciscan application for medical privileges to a specific fax number but that it seemed busy. She asked whether she should just retry or whether there was an alternative.

The next day, April 18, both Wallen and Atienza responded separately to their respective emails from Bruni. Wallen wrote,

> I am sorry for your difficulty, but at this point, your problems have a very negative impact on the function of our division. Your contract with us is endangered by your inability to apply for privileges at our institutions.
>
> We will not be able to have you start your contract on July 1 and we are going to have to change your schedule. In addition, there is no way that you will be able to arrive and start clinical service within one week. We have too much required orientation at both UWMC and SCH. We also do not think it is in the best interest of our patients or you to go on service with no orientation.
>
> Though I appreciate your loyalty to UCSF and desire to help them out over July 4, I hope that you have that same degree of responsibility towards your position with us. We need you to submit all of your credentialing paperwork today. Please do not delay any further.

Atienza pointed out in her email that Bruni had the wrong fax number and provided the correct fax number for the Franciscan credentialing office and contact information for Siler, who previously provided contact information and the correct fax number on March 10. Atienza also reminded Bruni that she still needed to send in her required documents to the University:

> Please send Marie Pasquale your UW required documents (see Appointment letter checklist) as soon as possible. I've listed Marie's

7

> mailing address below and its best if you send it in by 1 day air to meet the April 20th deadline for July 1st approval. It is also important to follow up with the three people who are writing your Letters of recommendation and make sure that they sent letters to F. Bruder Stapleton. Letters are needed to approve your academic appointment. . . .

That same day, Bruni thought she emailed the Franciscan application to Siler, but she only sent a copy of the "application request form" that Atienza had already provided to Siler over a month prior. Siler, on April 20, again provided the application by forwarding her previous March 10 email.

On April 20, Bruni emailed Coles that she had mailed her "whole application" in a single package to Pasquale that should arrive the next day and was faxing several other sections in the meantime. The next day, Pasquale, who was to receive documents related to the faculty appointment application, received the packet that "was mostly paperwork intended for other offices, primarily medical staff offices at both UW Medicine and Seattle Children's."

On April 22, Juul called Bruni telling her that she needed to finalize her application because her start date might be delayed. That same day, Atienza, who is Juul's administrative assistant, emailed Bruni again asking her to send the following as soon as possible: (1) the I-9 form, noting that Pasquale will not accept a copy or a fax, (2) three letters of recommendation from faculty of current/ past institutions, (3) a Washington State Medical License, for which she again provided application instructions, and (4) the DEA application, noting that Bruni would need to tell them her last working day in California and switch her license to Washington State. Atienza sent the list of these items because they were still outstanding. Atienza also reminded Bruni that the various other entities would email her about the status of her application as well

as forms and certificates that they need. Atienza again reminded Bruni that she needed to keep everything separate and to send materials to the correct location.

On April 25, Siler from Franciscan emailed Bruni confirming receipt of her application but noted that Bruni needed to resubmit two documents for wet signatures. Siler also requested a current curriculum vitae (CV) and noted that she would be returning the other documents Bruni submitted that did not belong to the credentialing department.

On April 26, at a meeting of the University's division leaders known as the Leadership Council, it was decided internally that Bruni had until April 29 to get all of her documentation in for credentialing or her contract would be jeopardized. On May 6, Stapleton emailed Bruni a letter rescinding the offer made on February 22.

Three years later, in July 2019, Bruni filed a complaint for damages in King County Superior Court, alleging that the University breached her employment agreement and willfully refused to pay wages in violation of RCW 49.52.050. Bruni sought damages in the form of monetary damages, double damages under RCW 49.52.070, attorney's fees and costs, and pre-judgment and post-judgment interest. On November 3, 2020, Bruni filed an amended complaint for damages clarifying that she was seeking attorney's fees and costs under RCW 49.48.030.

The University successfully moved for summary judgment as to Bruni's wage claim. The court dismissed Bruni's claim for willful refusal to pay wages under RCW 49.52.050, and it limited her potential damages to "the one-year time period of the contract at issue." The remaining issues were heard at a bench trial.

Juul testified that she has hired other neonatologists before and never experienced someone not immediately responding to an offer letter or not turning in employment materials after they have accepted an offer. Stapleton testified that he has hired between 30 and 50 people a year and has never encountered a circumstance where completing the application and credentialing could not be accomplished in the general window of 90 days.

Bruni testified at trial that she mailed the notarized I-9 form on April 22. She also testified that she submitted a copy of the DEA license that she had and that she could not transfer the license until the beginning of her new position. She also testified that she requested her letters of reference by April 1 and followed up with them about sending the letters. Bruni testified that after Siler alerted her as to what was missing from her Franciscan application on April 25, she believed she mailed the missing items the next morning.

Following trial, the court issued findings of facts and conclusions of law. The trial court "did not find Bruni's testimony regarding the efforts she expended to achieve compliance with her contractual obligations to be credible." The court concluded that timely completion of the application forms was a condition precedent for Bruni to do her job as offered by the University. The court found that Bruni submitted some of the requested items, but "[s]ome items were never completed. See, e.g., Ex. 228 (incomplete application to [Franciscan] as of April 25, 2020); Ex. 234 (incomplete I-9 form, insufficient copies of materials required in duplicate, missing DEA license application)." The court found that the University never received external letters of

recommendation but that the March 9 correspondence from the University only required Bruni to request letters of recommendation by April 1.

The court adopted the previous legal rulings stated in the Order on Defendant's Motion for Summary Judgment and denied the claim for willful refusal to pay wages with prejudice. The court concluded that the University's May 6 letter was not an improper repudiation of a contract and that Bruni failed to meet her burden of proof that the University breached its contract. The trial court entered judgment in favor of the University and awarded it costs.

Bruni filed a motion for reconsideration, which was denied by the trial court on February 10, 2021. Bruni appeals the order on summary judgment, the trial court's findings and conclusions, the order denying Bruni's motion for reconsideration,[3] and the judgment.

## DISCUSSION

Bruni first challenges the trial court's finding of fact number 23 finding that "[s]ome items were never completed. See, e.g., Ex. 228 (incomplete application to [Franciscan] as of April 25, 2020 [sic]); Ex. 234 (incomplete I-9 form, insufficient copies of materials required in duplicate, missing DEA license application)."

The trial court's findings of fact will be accepted as verities by the reviewing court so long as they are supported by substantial evidence. Katare v. Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). The substantial evidence standard is defined as a quantum of evidence sufficient to persuade a rational fair-minded person that the premise is true.

---

[3] Because Bruni assigned error to the trial court's denial of her motion for reconsideration but failed to argue that assignment of error, she has abandoned that argument, and we need not consider that issue. See RAP 10.3(a)(6) (stating the appellant must support argument with citations to legal authority and with references to the record).

Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). The deference accorded under the substantial evidence standard recognizes that the trier of fact is in a better position than the reviewing court to evaluate the credibility and demeanor of the witnesses. State v. Hill, 123 Wn.2d 641, 646, 870 P.2d 313 (1994).

A. *Franciscan Application*

Substantial evidence supports that Bruni did not properly complete her application to Franciscan. On April 18, Wallen emailed Bruni alerting her that her "contract with us is endangered by your inability to apply for privileges at our institutions" and that she needed to "submit all of [her] credentialing paperwork today. Please do not delay any further." That same day, Bruni thought she emailed the Franciscan application to Siler, but instead sent an application request form that had already been previously sent. This led Siler, on April 20, to forward her March 10 email with the application information to Bruni.

On April 25, Franciscan acknowledged receipt of the application but requested that Bruni replace her electronic signatures with wet ink signatures and submit a current CV. Bruni testified that she believed she mailed the missing documents the next morning. The trial court found her testimony not credible.

B. *I-9 Form*

Bruni also was required to complete the I-9 form with an accompanying form containing notary verification of her identification. Instead, Bruni submitted her I-9 form via email without the accompanying notary verification. This document was to be submitted by April 1. After several reminders, the last of which was on April 22, Bruni claimed that she mailed the notarized I-9 form on April 22. The trial court did not find

her testimony to be credible. Substantial evidence supports the court's finding that Bruni never completed the I-9 form.

## C. Insufficient Copies

Substantial evidence supports the court's finding that Bruni provided insufficient copies of materials required in duplicate.

Bruni was instructed multiple times to keep her applications to each of the different entities separate and that she had to submit her materials directly to the appropriate person for each entity. As Wallen testified to, while onerous, the reason multiple copies were needed was because "[e]very site at which [someone] need[s] to be credentialed generally requests all of the same documents, and they do not share with each other." Despite the March 9 instructions, Bruni mailed what she described as the "whole application" to Pasquale on April 20, leaving it to Pasquale to distribute some documents to different entities. Pasquale testified,

> This was unique. This was, I believe, the one and only time that I ever received paperwork in this manner and these types of forms for medical staff offices. We were – we tried to set people up at the onset of their appointment process to make it very clear that they would receive requests from multiple offices, and to track them carefully so that they could make sure to send the appropriate paperwork back to the requesting office.

Though it was not Pasquale's task to do so, she tried to identify the documents, organize them, and help facilitate the delivery to the correct entity. So when she received the mailing on April 21, she took inventory and noted that Bruni did not provide sufficient copies of at least five documents that were needed by multiple entities. This included her CV, DEA license, foreign diploma, board certifications, and her California professional license.

13

Bruni contends that because the March 9 letter did not state she had to provide duplicate copies of these documents, she did not know that was required. However, Bruni did not claim that she was not aware that multiple entities required these same documents as part of the individual applications. Nor does she dispute that she was instructed it was "important to keep all information received separate and return to the appropriate person."

*D. DEA License*

Substantial evidence supports the court's finding that Bruni never completed the DEA license application as requested.

In the March 9 letter, Bruni was told to, if needed, submit her DEA license application to the link provided in the letter and that she would "need a non-exempt, unlimited DEA license (paid)." Atienza again reminded Bruni, in an April 22 email, about the missing DEA license application and told her that she would have to tell them her last working day in California and switch her license to Washington State. Bruni concedes that she only submitted a copy of her California DEA license and testified that it "[c]ould not be transferred until the new – beginning of my new position." Not only did the trial court find Bruni's testimony not credible, her California DEA license states, "THIS CERTIFICATE IS NOT TRANSFERABLE ON CHANGE OF OWNERSHIP, CONTROL, LOCATION, OR BUSINESS ACTIVITY, AND IS NOT VALID AFTER THE EXPIRATION DATE." It is undisputed that Bruni never submitted an application for a DEA license for Washington State.

In light of the above, substantial evidence supports the court's finding of fact 23 that some items were never completed.

14

Condition Precedent

We next consider whether the trial court's findings support the trial court's conclusion that the clause "[i]f you accept this offer, you will be provided with credentialing forms that must be completed and returned as indicated" created a condition precedent in the February 22 offer of employment. Bruni contends that this clause was not a condition precedent. We disagree.

The legal effect of a contract is a matter of law that this court reviews de novo. Keystone Masonry, Inc. v. Garco Constr., Inc., 135 Wn. App. 927, 932, 147 P.3d 610 (2006). This includes whether a contract provision creates a condition precedent. See Tacoma Northpark, LLC v. NW, LLC, 123 Wn. App. 73, 80, 96 P.3d 454 (2004). A condition precedent is an event that must occur before there is a right to immediate performance of a contract. Id. at 79. "Whether a contract provision is a condition precedent or a contractual obligation depends on the intent of the parties." Id. at 80. Where the parties' contractual language is ambiguous, the principal goal of construction is to search out the parties' intent. Jones Associates, Inc. v. Eastside Properties, Inc., 41 Wn. App. 462, 467, 704 P.2d 681 (1985). This court takes into account all of the surrounding circumstances to determine intent from a fair and reasonable construction of the language used. Tacoma Northpark, LLC, 123 Wn. App. at 80. "The intent of the parties to create a condition precedent may often be illuminated by phrases and words such as 'on condition,' 'provided that,' 'so that,' 'when,' 'while,' 'after,' or 'as soon as.'" Lokan & Associates, Inc. v. Am. Beef Processing, LLC, 177 Wn. App. 490, 499, 311 P.3d 1285 (2013) (citing Ross v. Harding, 64 Wn.2d 237, 391 P.2d 526 (1964)). In cases where doubt exists regarding whether parties have created a promise or an

15

express condition, this court should interpret the language in question to create a promise. Id.

"In contrast to the breach of a promise, which subjects the promisor to liability for damages but does not necessarily discharge the other party's duty of performance, the nonoccurrence of a condition prevents the promisee from acquiring a right or deprives him of one but subjects him to no liability." Jones Assocs., 41 Wn. App. at 466.

Bruni relies on Jones Associates to support her position that the "as indicated" clause was not a condition precedent. In that case, Jones Associates, an engineering firm, entered into a contract with Eastside Properties (Eastside), a real estate corporation, to provide services for Eastside's land parcel. Id. at 463-64. At issue was whether the following provision in the contract created a condition precedent to payment: "'Engineer shall be responsible for obtaining King County approval for all platting as set forth above.'" Id. at 465. On appeal, the court concluded that the provision was a promise rather than a condition precedent for multiple reasons. First, the provision did "not expressly indicate that if King County approval was not obtained, Eastside would not be responsible for any costs whatsoever," like the preceding paragraph did. Id. at 467-68. Second, other provisions of the contract contemplated necessary services related to the short plat application rather than obtaining King County final plat approval. Id. at 468. Third, the parties' conduct supported that obtaining approval was not a condition precedent to payment from Eastside because Eastside did tender payment despite the nonoccurrence of the alleged condition precedent—Jones Associates' failure to obtain King County approval. Id. at 464.

Jones Associates is distinguishable. Jones Associates entered into a contract with Eastside for work, did that work, and was paid for that work. In the instant case, Bruni never submitted completed materials in order for the University to seek the required approval to be appointed to the faculty. In other words, Bruni was not hired and then fired for turning in some documents late. Bruni never completed all the documents needed to get appointed. The contract, in relevant part, expressly stated,

> The terms of this offer are outlined below.
>
> We would *propose your appointment* to the faculty as a full-time Clinical Associate Professor effective July 1, 2016. Your *appointment would require the concurrence of several review bodies*, including the Department of Pediatrics Appointments and Promotions Committee, the voting faculty of the Department, the School of Medicine Dean and University bodies. *This offer is contingent on these approvals.*
> . . . .
>
> In order for you to begin work and see patients, you *must have obtained the following*: 1) your license to practice medicine In the State of Washington, 2) a medical staff appointment at Seattle Children's Hospital, the University of Washington Medical Center and St. Josephs [sic] Medical Center Franciscan 3) a faculty appointment, and 4) membership in the physicians practice plan.
>
> If you accept this offer, you will be provided with credentialing forms that *must be completed and returned as indicated*.
> . . . .
>
> Your *employment in this position is conditioned*, *among other approvals*, upon obtaining a satisfactory criminal conviction background check result.

(Emphasis added.) On March 9, the University sent Bruni the list of items to be completed, including forms that were to be filled out and returned by April 1. This list included external letters of recommendation, the DEA license application, and the requirement that the applications need to be sent separately to various entities.

Bruni argues that none of the conditional phrases enumerated in Ross v. Harding ("on condition," "provided that," "so that," "when," "while," "after," or "as soon as") were used in the provision, which supports her contention that "as indicated" is not conditional language. 64 Wn.2d at 237.

Ross v. Harding merely lists examples of conditional phrases and does not suggest that the determinative language equating to a condition precedent must come from an exhaustive list. "Any words which express, when properly interpreted, the idea that the performance of a promise is dependent on some other event will create a condition." Id. The offer letter explained that her appointment was subject to approval of various bodies, that she must complete credentialing forms as indicated, and that her employment in this position was conditioned upon other approvals. The plain language of the offer establishes that the University's promise, to seek approval of appointing Bruni to the faculty with a July 1 start date, was dependent on receiving completed documents as indicated in the March 9 letter.

The timely completion of pre-employment forms was a condition precedent to the University moving forward with the appointment.

### Substantial Performance

We next determine whether the condition precedent was fulfilled, which Bruni argues that she accomplished through substantial performance. We disagree.

A condition precedent is not fulfilled unless there has been substantial performance. Taylor v. Ewing, 74 Wash. 214, 220, 132 P. 1009 (1913). Where a party fails to fulfill a material condition precedent, the defendant is relieved of all liability under the contract. Ross, 64 Wn.2d at 241. "The doctrine of substantial performance is

18

applied in rare instances where only 'minor and relatively unimportant deviations' remain to accomplish full contractual performance." Taylor v. Shigaki, 84 Wn. App. 723, 729, 930 P.2d 340 (1997).

In the instant case, Bruni argues that she substantially performed because, as of May 6 when the University rescinded its offer, only "trivial" items were outstanding—such as wet signatures, a notarized I-9 form, a copy of Bruni's CV, duplicate copies of documents, and a DEA license.

Bruni cites to a foreclosure case, U.S. Bank Nat'l Ass'n v. Roosild, to argue that returning paperwork late was not a material breach. 17 Wn. App. 2d 589, 487 P.3d 212 (2021). However, Division Two explicitly limited its decision to "whether the doctrine of substantial performance applies to a lender's compliance with a condition precedent arising from a deed of trust." Id. at 600. Even if we were to consider and apply it here, her claim that the breach was not material still fails. The Roosild court explained that if it is determined a breach of contract is material or goes to the root or essence of the contract, it follows that substantial performance has not been rendered, and further performance by the other party is excused. Id. at 602-03.

The record establishes that the University repeatedly reached out to Bruni to timely complete her documents in order to have her credentialed and approved to start on July 1 as agreed to by the parties. The trial court found that the materials itemized in the March 9 letter were due by April 1 in order to meet the aspirational goal of a start date of July 1 and that she did not return them by April 1.[4] Bruni does not challenge

---

[4] We note that it is apparent from the record that it was a scrivener's error where the trial court indicated the year of 2020 in its findings of fact relating to events in 2016 and treat it as such.

19

these findings of fact and as such they are verities on appeal.  Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

Juul testified that the start date is very important because the clinical schedule is created around knowing how many faculty are present and working at that time.  Juul explained that a lot of work goes into those schedules:  "We have five level III units, and we have to schedule both daytime and nighttime for each one.  And there's – for example, at the University of Washington, there's two teams.  For Seattle Children's there's three teams, so there's five daytime teams right there.  Plus you have to do night call, and then the same thing basically for all of the other units.  So it's a very complicated piece of work very lots of moving pieces. . . .  It takes a [lot] of time."

Bruni never asked for a different start date or questioned the importance of the deadlines she was given for her documents.  She waited until April 17 to email Wallen to tell her, not ask her, that she would be arriving after July 4 to get oriented regardless of when she would be officially on service noting, "I hope it all works out."  It was after receiving this email that Wallen alerted Bruni that the University would not be able to have her start her contract on July 1 and that her contract was endangered by her inability to apply for privileges at the institutions.

Not only did Bruni fail to get credentialed to start work on July 1, in doing so she impacted the staffing schedules of many other teams at multiple institutions.

Bruni did not substantially perform, and submitting the requested documents on time was a material condition precedent.

Waiver

Bruni also contends that if there was a condition precedent, the University waived it by requesting or accepting performance after the deadlines it subsequently set.  We disagree.

Whether actions constitute waiver of a contractual term is a conclusion of law reviewed de novo.  Mid-Town Ltd. P'ship v. Preston, 69 Wn. App. 227, 232, 848 P.2d 1268 (1993).  A waiver requires "the voluntary relinquishment of a known right." Cornerstone Equip. Leasing, Inc. v. MacLeod, 159 Wn. App. 899, 909, 247 P.3d 790 (2011).  Generally, a waiver can be express or can be inferred from circumstances indicating an intent to waive.  Matter of Estate of Petelle, 195 Wn.2d 661, 665, 462 P.3d 848 (2020).  An express waiver is governed by its own terms, while an implied waiver can be found based on conduct establishing intent to waive a right.  Id.  (citing Reynolds v. Travelers' Ins. Co., 176 Wash. 36, 45, 28 P.2d 310 (1934)).

Bruni argues that the condition precedent, to return and complete the materials as indicated, was waived because the University allowed amended return deadlines. On March 9, Atienza sent an email with an attached letter to Bruni stating, "Attached are forms for your faculty appointment in the Department of Pediatrics.  Please fill out and return to Marie Pasquale by April 1, 2016."  In the March 9 list of documents needed, for item number 11, the medical staff application for Seattle Children's Hospital, Atienza wrote that the application would be sent to her home and "[b]e sure to complete at your earliest convenience.  If you delay in returning, this could impact your credentialing start date."

21

On March 28, Atienza reminded Bruni her application packet was due that week, and on April 4, Atienza asked Bruni to let her know when she has sent her UWMC packet out and under what tracking number. On April 7, 2016, Wallen wrote Bruni stating, "It is urgent that you submit the paperwork for credentialing at UWMC. If this paperwork is not submitted it is possible that your start date may need to be delayed." On April 11, 2016, Atienza asked Bruni, "Can you please give me an update on your application for UW and SCH. Your packets are 11 days late and we might have to delay your start date without pay until your credentialing is approved." On April 15, Juul wrote to Bruni, "I have been apprised that you have not yet sent in the necessary paperwork for credentialing purposes. Please take care of this immediately, or let me know why you cannot do so."

On April 17, in an email to Wallen, Bruni said she could not come up to Seattle until after July 4. On April 18, Wallen emailed Bruni and told her that she needed to submit all of her credentialing paperwork "today" and wrote "[p]lease do not delay any further." It was in this same email that Wallen warned Bruni that her contract with the University was endangered by her inability to apply for privileges at the University's institutions. That same day, Atienza emailed Bruni to send her the UWMC required documents "as soon as possible."

Meanwhile, after learning Bruni could not start on July 1, the University was scrambling to adjust schedules and determine a possible "best case scenario" of a July 15 start date depending "on how quickly she responds to requests and if she mailed a complete packet."

On April 21, Juul told Bruni that her materials had not been received, that she still needed to finalize her application, and that her start date could be delayed if the materials did not appear "ASAP."

Bruni points to the fact that on April 26, the University's Leadership Council decided that Bruni had until April 29 to complete her materials or her contract would be jeopardized. This internal deadline was not communicated to Bruni. On May 6, Bruni's contract was rescinded by the University.

Remarkably, Bruni contends that she should have been told about the council's extension. She misinterprets the council's decision. The record suggests that the leadership council gave itself a deadline as to how long it would wait to see if Bruni completed her materials before taking action.

There was never an express waiver of the condition precedent by the University. In all of its communications, the University never expressed that Bruni was relieved of her condition precedent to get her materials in as indicated. The several communications merely reflect the urgency of trying to get Bruni to submit her materials as soon as possible once they were late.

The main inquiry is whether the University impliedly waived the condition precedent. "To constitute implied waiver, there must exist unequivocal acts or conduct evidencing an intent to waive; waiver will not be inferred from doubtful or ambiguous factors. The intention to relinquish the right or advantage must be proved, and the burden is on the party claiming waiver." 224 Westlake, LLC v. Engstrom Properties, LLC, 169 Wn. App. 700, 714, 281 P.3d 693 (2012).

23

Bruni relies on Beardslee v. North Pacific Finance Corp., 161 Wash. 86, 296 P.155 (1931), and Reinertson v. Grant, 140 Wash. 372, 24 P. 493 (1926), to argue that once the University agreed to accept late documents, it was required to give Bruni notice that the University would rescind its offer if she did not strictly comply with a new deadline. In Beardslee, the respondent waived its right to insist upon forfeiture of a repossessed car for failure to make timely payments when it temporarily waived that right by accepting late payments. Beardslee, 161 Wash. at 87. Thus, the respondent could not enforce the provision for forfeiture for failure to pay until the respondent had given reasonable time for the appellant to comply with the terms of the contract. Id. at 95. In Reinertson, the forfeiture provision of a real estate contract had been waived by the extension of time. Reinertson, 140 Wash. at 374. Thus, forfeiture required first giving notice of an intention to do so with a reasonable time for compliance. Id. Both of those cases are forfeiture cases that are inapposite here.

The University may have waived its adherence to the July 1 start date after Bruni alerted the University that she could not start until after July 4, but it did not waive the requirement that she still submit the employment materials timely. The University told her multiple times to provide her materials as soon as possible and to not delay any further. As discussed above, some items requested by the University were never completed. The University gave Bruni reasonable time to complete her application materials and she failed to timely do so.

Even if the University waived the original deadlines, the University still required Bruni to provide complete pre-employment materials within a reasonable period of time, which she failed to do.

Repudiation

Bruni contends that it was the University's burden to prove Bruni would not have satisfied the conditions precedent had the University not repudiated the offer. We disagree.

An improper repudiation "must occur before the other party's performance is due." Grant County Port Dist. No. 9 v. Washington Tire Corp., 187 Wn. App. 222, 231, 349 P.3d 889 (2015). Where a party fails to fulfill a material condition precedent, as Bruni did, the other party to the contract is relieved of all liability under the contract. Ross, 64 Wn.2d at 241. "[T]he rule governing conditions precedent is: 'Where a defendant's obligation is subject to a condition precedent of performance by the plaintiff, the latter must allege and prove that he: (1) performed the condition precedent, or (2) was excused from performance.'" Langston v. Huffacker, 36 Wn. App. 779, 786, 678 P.2d 1265 (1984) (quoting 6 S. Williston, Contracts § 832 (3d ed. 1962)); accord Restatement (Second) of Contracts § 225 (1979). Application of this rule imposes upon the plaintiff the burden of proving performance or excuse.

Substantial evidence supports Bruni failed to complete the condition precedent and return the pre-employment materials as indicated. Even if there was a waiver of the July 1 start date, the University did not waive timely completion of the materials as requested. Bruni has not established that she performed the condition precedent or was excused from performance. Bruni's failure to satisfy the condition precedent relieved the University of moving forward with the appointment.

The trial court did not err by concluding that the University's May 6 letter was not an improper repudiation of the contract. We affirm the trial court's denial of Bruni's breach of contract claim.

Wage Claim

Bruni contends that summary judgment was improperly granted against Bruni's RCW 49.52.070 claim for double damages because she had signed an employment agreement and performed "pre-employment" tasks for it. We disagree.

On appeal of an order granting summary judgment, we review de novo whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); See Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

To establish a claim for willful withholding of wages, Bruni had to prove: (1) that the University was her "employer," (2) that her employer paid her "a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract," and (3) that the withholding of wages was done "[w]ilfully and with intent to deprive the employee of any part of his or her wages[.]" RCW 49.52.050(2). A failure of any one of these factors is sufficient to defeat a willful withholding claim.

Bruni's claim fails under the first element—the University never employed Bruni. The contract was an offer of appointment that required approval by others. During her deposition, she testified that she never started her job at the University, never performed work on behalf of the University, and never worked any hours as an employee. However, later through a declaration, she contradicted herself, which does

not by itself create a genuine issue of material fact. "Self-serving affidavits contradicting prior sworn testimony cannot be used to create an issue of material fact." Jones v. State, Dep't of Health, 170 Wn.2d 338, 370, 242 P.3d 825 (2010). Her prior sworn testimony was clear. Bruni's contradiction, that she performed work by completing "administrative work," and by "assisting in the creation of the call schedule and [spent] numerous hours filling out personnel forms," is self-serving and therefore does not create an issue of material fact.

Because Bruni could not show a genuine issue as to whether the University was her employer, we need not address the remaining elements. We conclude that the trial court did not err in partially granting the University's summary judgment motion.

## Attorney Fees

Bruni requests attorney fees under RCW 49.48.030, which provides, "In any action in which any person is successful in recovering judgment for wages or salary owed to him or her, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer or former employer. . ." Because Bruni's claims fail, she is not entitled to attorney fees.

We affirm.

_____
Coburn, J.

WE CONCUR:

_____        _____
Chung, J.                                Verellen, J.

27